**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**IN RE PLUG POWER INC. SECURITIES LITIGATION**

**No. 1:24-cv-00406-MAD-DJS**

**THIS DOCUMENT RELATES TO: ALL ACTIONS**

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**


I. NATURE OF THE ACTION ........ 1

II. JURISDICTION AND VENUE ........ 4

III. THE PARTIES ........ 4

A. Plaintiffs ........ 4

B. Defendants ........ 5

IV. SUBSTANTIVE ALLEGATIONS ........ 7

A. Company Background ........ 7

B. Hydrogen Production Timelines ........ 8

C. Operational and Financing Problems ........ 11

D. Material Misstatements and Omissions ........ 18

1Q23 Quarterly Report ........ 19

1Q23 Press Release ........ 20

1Q23 Conference Call ........ 22

Analyst Day ........ 23

2Q23 Quarterly Report ........ 24

2Q23 Press Release ........ 26

2Q23 Conference Call ........ 27

Analyst Day ........ 28

Annual Symposium ........ 30

3Q23 Quarterly Report ........ 31

3Q23 Press Release ........ 33

3Q23 Conference Call ........ 34

E. Corrective Disclosures, Loss Causation and Economic Loss ........ 35

F. Scienter Allegations in Support of Exchange Act Violations ..................................... 38

Direct Knowledge of the Georgia Plant's Status ......................................................... 38

Core Operations and Magnitude of Delays ................................................................. 40

G. Presumption of Reliance; Fraud-on-the-Market ......................................................... 41

H. No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine ................................. 42

V. CLASS ALLEGATIONS ......................................................................................................... 43

VI. PRAYER FOR RELIEF ......................................................................................................... 49

VII. JURY DEMAND ................................................................................................................... 49

Lead Plaintiffs David Bruder and Randy Slipher and Additional Named Plaintiffs Scott Keenan and Jose Martinez (collectively "Plaintiffs"), by their undersigned attorneys, allege in this Class Action Complaint (the "Complaint") the following upon personal knowledge with respect to their own acts, and upon facts obtained through an investigation by their attorneys and review of documents and materials including but not limited to: (a) relevant filings made by Plug Power, Inc. ("Plug" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) public documents, conference calls, and press releases; (c) research analysts' reports concerning the Company; and (d) interviews of confidential witnesses with personal knowledge of relevant facts. Plaintiffs believe that further substantial evidentiary exists for the allegations set forth herein after a reasonable opportunity for discovery. Certain of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## I. NATURE OF THE ACTION

1. Plug Power Inc. ("Plug" or the "Company") presents itself as a leader in the hydrogen industry, developing and marketing fuel cell systems and related technologies. Plug's revenue streams include sales of hydrogen fuel cell systems related infrastructure and equipment, services performed on fuel cell systems and related infrastructure, Power Purchase Agreements (PPAs), and fuel delivered to customers. A significant portion of its revenue is generated through long-term agreements with customers who use Plug's hydrogen fuel cells in warehouses and distribution centers. These contracts obligate Plug to supply hydrogen fuel, but historically Plug has lacked the ability to produce sufficient liquid hydrogen by itself. Plug has been forced to purchase liquid hydrogen from third-party suppliers at high cost and resell it to customers at a loss, creating sustained negative margins on its fuel delivery business

2. To address these losses and better support its operations, Plug announced plans to build a network of green hydrogen production facilities across North America, beginning with a 15 tons-per-day ("TPD") liquid hydrogen plant in Woodbine, Georgia (the "Georgia Plant"). The Georgia Plant was described by Defendants as central to Plug's strategy to vertically integrate hydrogen production, reduce reliance on third-party suppliers, improve its negative fuel margins, and serve as a model for additional plants in Texas, and New York.

3. The Georgia Plant carried particular significance because Plug represented that it would be the first facility to use Plug's own electrolyzers to produce hydrogen that would then be liquefied and delivered to customers. The Company repeatedly told investors that the plant would begin producing liquid hydrogen in the second quarter of 2023 and emphasized that the project was being executed on a compressed timeline relative to industry norms, presenting it as evidence of Plug's execution capabilities. These claims were highly material to analysts and investors because the sooner Plug could produce its own hydrogen, the sooner it could stop relying on third-party suppliers and start operating under profitable margins. Defendants claimed that their "internal production of green hydrogen" would have a "transformational effect" on Plug's margins.

4. Defendants' representations about the Georgia Plant and Plug's progress towards generating liquid hydrogen were materially false and misleading. At the time they were made, critical construction and commissioning steps at the Georgia Plant were incomplete, and Defendants knew or recklessly disregarded that the promised June 2023 deadline was not achievable. Furthermore, during this time period, Plug faced financial and operational difficulties, including chronic failures to pay vendors and contractors on time, resulting in delayed delivery of critical parts. These undisclosed funding issues further impeded Plug's ability to meet its promised timeline and contradicted their public statements about their ability to internally produce hydrogen

and bring operating margins in line with publicly stated targets.

5. Rather than disclose these material facts, Defendants continued to assure investors that production was imminent, even after missing the June 2023 deadline. In August 2023, Defendants shifted the target to that month, attributing the missed deadline to summer heat and minor productivity issues. In October and November 2023, after failing to meet the promised August 2023 deadline, Defendants again represented that the plant was in its final steps and would be online by year-end. In reality, the Georgia Plant did not begin producing liquid hydrogen until January 2024, seven months after the originally promised deadline.

6. The facts surrounding Defendants' conduct give rise to a strong, cogent and compelling inference of scienter. Plug was facing critical cash flow shortages during the Class Period that prevented it from paying its third-party suppliers and receiving components integral for operations across its entire business. Plug's inability to obtain necessary components delayed construction at the Georgia Plant, prevented it from completing commissioning, and stopped it from successfully producing liquid hydrogen. This was known by Plug's senior executives, including Defendant Marsh, based on the fact that they regularly visited the Georgia Plant and witnessed that it was not producing liquid hydrogen at levels necessary to support the 15 TPD targets they provided to the public. Notwithstanding, Defendants repeatedly provided investors with progress reports and promises concerning the Georgia Plant's supposed imminent production of hydrogen that consistently failed to materialize.

7. Defendants' false and misleading statements and omissions caused significant investor losses, as the market price for the Company's stock declined with each delay and new deadline announcement. To recover these losses, Plaintiffs bring this lawsuit on behalf of all persons and entities that purchased or acquired Plug common stock between May 9, 2023 and January 16, 2024, inclusive

(the "Class Period"), alleging violations under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5(b).

## II. JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because the Company's headquarters are located in this District and certain of the acts alleged in this Complaint occurred in this District.

11. In connection with the acts, conduct and other wrongs alleged in this Complaint, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. THE PARTIES

### A. Plaintiffs

12. Lead Plaintiff David Bruder purchased Plug common stock within the Class Period and, as a result, was damaged thereby. Mr. Bruder's certification evidencing his transactions was filed previously with the Court in connection with his motion for appointment as lead plaintiff and is incorporated herein by reference.

13. Lead Plaintiff Randy Slipher purchased Plug common stock within the Class Period and, as a result, was damaged thereby. Mr. Slipher's certification evidencing his transactions was

filed previously with the Court in connection with his motion for appointment as lead plaintiff and is incorporated herein by reference.

14. Additional named plaintiff Scott Keenan purchased Plug common stock within the Class Period and, as a result, was damaged thereby. Mr. Keenan's certification evidencing his transactions was filed previously with the Court in connection with his motion for appointment as lead plaintiff and is incorporated herein by reference.

15. Additional named plaintiff Jose Martinez purchased Plug common stock within the Class Period and, as a result, was damaged thereby. Mr. Martinez's certification evidencing his transactions was filed previously with the Court in connection with his motion for appointment as lead plaintiff and is incorporated herein by reference.

**B. Defendants**

16. Plug is a hydrogen energy company that manufactures, sells, and services hydrogen fuel systems and related infrastructure. Plug is incorporated under the laws of Delaware with its principal executive offices located in Latham, New York and its common stock trades on the Nasdaq Global Sector Market under the ticker symbol "PLUG."

17. Defendant Andrew Marsh ("Marsh") was, at all relevant times, Chief Executive Officer ("CEO") and a director of Plug.

18. Defendant Paul B. Middleton ("Middleton") was, at all relevant times, Chief Financial Officer ("CFO") of Plug.

19. Defendant Sanjay K. Shretha ("Shretha") was, at all relevant times, Executive Vice President, General Manager of Energy Solutions, and Chief Strategy Officer ("CSO") of Plug.

20. Defendants Marsh, Middleton, and Shretha are collectively referred to herein as the "Individual Defendants." The Individual Defendants, together with Plug, are referred to herein as the

"Defendants."

21. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(e) was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(f) approved or ratified these statements in violation of the federal securities laws.

22. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Plug's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public,

and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Company Background

23. Plug develops and sells hydrogen fuel systems, and related infrastructure. Its business spans the hydrogen supply chain: (i) manufacturing proton exchange membrane ("PEM") electrolyzers that use electricity to separate hydrogen from water; (ii) selling hydrogen fuel cells, devices that convert hydrogen into usable energy for industrial and stationary power applications; and (iii) providing hydrogen fuel to customers under long-term contracts.

24. Plug's revenue streams include sales of hydrogen fuel cell systems related infrastructure and equipment, services performed on fuel cell systems and related infrastructure, Power Purchase Agreements ("PPAs"), and fuel delivered to customers. A significant portion of its revenue is generated through long-term agreements with customers such as Amazon and Walmart, which use Plug's hydrogen fuel cells in warehouses and distribution centers. These contracts obligate Plug to supply hydrogen fuel, but historically the Company has lacked the ability to produce sufficient liquid hydrogen by itself. Plug has been forced to purchase liquid hydrogen from third-party suppliers at high cost and resell it to customers at a loss, creating sustained negative margins on its fuel delivery business.

25. To address these losses, Plug announced a "vertical integration" strategy beginning in 2019. This plan focused on producing green hydrogen through its own electrolyzers, liquefying it at dedicated facilities, and distributing it through its network of customers. Central to this

strategy was the construction of several liquid hydrogen plants across the United States. The first and most important of these projects was the 15-tons-per-day ("TPD") liquid green hydrogen plant in Woodbine, Georgia (the "Georgia Plant"). Plug promoted the Georgia Plant as a model facility that would demonstrate its ability to build and operate hydrogen production on a large scale, reduce reliance on third-party suppliers, and materially improve hydrogen fuel margins.

26. The Georgia Plant carried particular significance because Plug represented that it would be the largest facility to use Plug's own electrolyzers to produce hydrogen that would then be liquefied and delivered to customers. The Company repeatedly told investors that the plant would begin producing liquid hydrogen in the second quarter of 2023 and emphasized that the project was being executed on a compressed timeline relative to industry norms, presenting it as evidence of Plug's execution capabilities. Plug further identified the Georgia Plant as a "roadmap" for future facilities, meaning its success or failure would directly influence the feasibility of the Company's broader hydrogen build-out. For these reasons, the status and timing of the Georgia Plant were material to investors evaluating Plug's business model and financial outlook.

### B. Hydrogen Production Timelines

27. In 2021, Plug announced plans to construct multiple liquid hydrogen facility across North America, including a 15 TPD liquid green hydrogen facility in Woodbine Georgia, the Georgia Plant. The Georgia Plant was a cornerstone of the Company's strategy to vertically integrate hydrogen production, reduce reliance on third-party suppliers, improve its fuel margins, and "reinforce Plug's dominance in green hydrogen."

28. When fully constructed, the Georgia Plant would utilize eight 5-megawatt electrolyzers designed to split water into hydrogen and oxygen before liquefying the hydrogen and then transporting it to fueling stations. Plug promoted construction of the Georgia Plant based on

its use of vertical integration; specifically, Plug intended to use components manufactured in-house or at other facilities owned by Plug to complete construction of the Georgia Plant. This included, in pertinent part, the electrolyzers used to create the liquid hydrogen that were assembled at Plug's Vista Technology Park facility in Slingerlands, New York.

29. Plug repeatedly told investors that the Georgia Plant would begin producing 15 TPD of liquid hydrogen by the second quarter of 2023. Specifically, on the May 9, 2023 earnings call, Plug stated: "our plants [are] already producing gases hydrogen for our customers, and we [expect] to achieve full production by the end of June . . . I'm going to be walking Georgia today, I'm excited."

30. In its May 2023 investor presentation, the Company listed the Georgia Plant as "Georgia 1st 15TPD – Q2 '23." On June 14, 2023, just two weeks before the promised completion date, Defendant Marsh stated: "So I'm walking Georgia with the Head of S&P… So the important item is Georgia will be putting out liquid at the end of the month, and I can't wait."

31. Defendants tied the Georgia Plant's compressed timeline to Plug's financial performance. In its various communication with investors, including earning calls and press releases, Plug stated that once operational, the Georgia Plant would materially reduce the Company's negative fuel margins by replacing high-cost third-party hydrogen purchases with in-house production. The Company further identified the Georgia Plant as the template for additional facilities across the United States, such as Texas and New York, meaning the project's success was critical not only to near-term margins but also to the viability of Plug's broader build-out plan.

32. Defendants also presented the Georgia Plan's compressed timeline as evidence that Plug could execute faster and more efficiently than the rest of the hydrogen industry. Defendants portrayed this speed as part of Plug's core competitive advantage and a key reason for investors to

believe in Plug's ability to meet its ambitious production and profitability targets.

33. However, the accelerated schedule represented by Defendants was not feasible and Defendants knew or recklessly disregarded this. Building a liquid hydrogen plant requires extensive permitting, construction, and commissioning, including equipment reviews and the installation and testing of liquefiers and cold box systems. Plug's own disclosures noted that the industry standard for such plants was approximately four years. By claiming it would complete the Georgia Plant in a year or less, Defendants touted a timeline that was unattainable in practice and materially misleading to investors.

34. By June 30, 2023, the end of Q2, the Georgia Plant was not producing liquid hydrogen. Key components, including the liquefaction system, remained in commissioning throughout the third and fourth quarters of 2023. Nevertheless, Defendants did not disclose that the June 2023 target had been missed and instead continued to reassure investors that final commissioning was underway. On August 9, 2023, Plug stated that "we are going to be producing liquid here in the month of August. We're very much looking forward to hosting you all on August 23, and we're essentially wrapping up the plant at this point in time." Plug attributed the delays to reduced productivity due to heat levels and utilizing learnings from other sites.

35. On August 23, 2023, Plug made no announcement that the Georgia Plant had begun producing hydrogen.

36. On October 11, 2023, Plug again assured investors that progress was being made: "[w]e're continuing to see progress at our Georgia plant, and we are finishing the last step in the construction process, commissioning the liquefier. We expect the plant to be online by year-end," providing no substantive explanations for the further delay.

37. It was not until January 23, 2024 that Plug finally announced that its Georgia Plant

had started production of liquid green hydrogen that month. This disclosure confirmed that the project was delayed by approximately seven months from the June 2023 deadline Defendants had repeatedly presented and affirmed.

### C. Operations and Cash Flow Problems

38. In addition to the unrealistic accelerated timeline, Plug was also facing serious internal and financial challenges that made timely completion of the Georgia Plant even less feasible. Former employees have confirmed that the Company struggled with cash flow and vendor management during the Class Period.

39. Former Employee 1 ("FE1") was previously employed at Plug as Senior Manager of Manufacturing from 2021 to 2024 and reported to the David Mindnich, the Executive Vice President of Global Manufacturing at Plug, who in turn reported directly to CEO Marsh. FE1's job duties include implementing standard operating procedures ("SOP"), sales inventory system, and structured operational planning programs, organizing plant layouts, and optimizing operational flow, and addressing other existing operational issues. FE1 led manufacturing for hydrogen fuel cell self-assemblies, new product introduction, and oversaw Plug's storage systems and electrolyzers. FE1's team established hydrogen plant infrastructure and new production processes.

40. According to FE1, Plug was not paying its vendors. FE1 complained, making multiple calls to the relevant departments within Plug but received no responses or follow-up communications. Mindnich was also aware of the situation and, according to FE1, did his best to convey the message to others, including Marsh.

41. FE1 indicated that there were periods when vendors were not receiving payments, resulting in Plug's inability to obtain necessary parts for battery cell assembly. Contrary to this,

Plug attributed delays in parts delivery to efforts in establishing new suppliers, supply chain challenges in China, and issues with local or nationwide supplier chain redundancy. Although the official communication suggested these issues were being addressed, parts shortages were interfering with operations and led to shutdowns of manufacturing lines.

42. Plug experienced a shortage of hydrogen fuel due to non-operational plants in Georgia and Tennessee. The elevated cost of externally sourced hydrogen further impacted profitability. According to FE1, CEO Marsh and CFO Middleton prioritized substantial quarterly bonuses, allocating funds to themselves while limiting resources available for supply procurement, investment in hydrogen facilities, vendor payments, or meeting customer requirements. The operational impact on FE1's plants, coupled with the fact that the Georgia and Tennessee hydrogen plants under development were not yet functional (thereby requiring Plug to continue sourcing hydrogen externally), demonstrated that Plug was behind schedule.

43. Regular internal updates regarding pending production from Georgia and Tennessee were expected but were never issued. In June 2023, FE1, who lived near Plug's Tennessee plant, visited the site to see why Plug was purchasing hydrogen elsewhere while supposedly operating its own facility. FE1 found only one staff member there, who explained the plant was not running because of unresolved issues and was waiting for funding to fix them. The plant was completely non-operational. As Senior Manager of Manufacturing, FE1 felt compelled to visit the plant to investigate. FE1 mentioned that the fuel was essential for operating the plants; it was needed for testing internal vehicles and running leak checks prior to selling and shipping any product. FE1 said the Tennessee plant lacked funds for full operations, ran partially, then shut down. Plug was still waiting for funding after FE1 left in 2024. According to FE1, the Georgia plant suffered from the same lack of funding.

44. Former Employee 2 ("FE2") was a contractor and consultant for Plug from 2022 to 2023. FE2's job duties included assembling fuel test stands, overseeing installation and connections, and working on hydrogen pads. FE2 stopped working for Plug after Plug stopped paying FE2 with approximately $500,000 left in unpaid invoices. FE2's payment inquiries were ignored or met with automated phone responses, and calls to procurement and accounting were unsuccessful. There was nobody offering to help get FE2 paid, and no department helped.

45. FE2 explained that Plug faced challenges due to insufficient funds to pay vendors or contractors. During 2023, financial resources were insufficient to acquire parts. This situation occurred around 2023, coinciding with Plug cybersecurity breach after which the Company paid a ransom, according to FE2. During this period, accounts were inaccessible, preventing payments.

46. FE2 attempted to help Plug by covering certain costs and/or ordering parts through FE2's purchasing contracts with other vendors. For example, on one occasion, a flatbed truck from Buffalo arrived with parts but refused to make the delivery without receiving payment, which Plug could not provide. FE2 resolved the issue by writing a check instead. In another example, FE2 described work at Plug's Kodak Park facility that ultimately was completed by outside sources. To complete the necessary installations, project materials were sourced through Conquest, not Plug. Moreover, when Schlage Locks reduced service to Plug, FE2 maintained the relationship via a shared salesperson.

47. Despite FE2's efforts to support Plug, the company faced cash flow problems and unpaid vendors which led to operational problems, according to FE2. For example, FE2 stated that work on the fuel cell test stands was delayed due to vendor non-payment issues. FE2 explained that Plug ceased payments, which resulted in the vendor discontinuing deliveries. FE2 connected approximately half of the test stands but then ran out of money and shifted their focus to different

installations. Fuel cell test stands were utilized for testing dual cells prior to shipment.

48. Former Employee 3 ("FE3") was previously employed at Plug as a Senior Floor Supervisor at the Vista Plant from 2021 to approximately March 2023 and reported to Chris Kenny, Senior Director of Manufacturing Operations. FE3's job duties included setting up the Vista facility, managing the shop floor, overseeing managers and operations, and constructing assembly lines improving battery assembly efficiency.

49. FE3 explained that Plug's senior management made decisions without accounting for feedback from ground operations. For example, FE3 recalled that battery assembly parts could no longer be purchased and later learned this was because Plug stopped paying vendors. FE3 explained that, without the parts there would be no batteries. Suppliers informed FE3 via email that they were ceasing shipments of additional parts until outstanding invoices were paid, which resulted in production being halted.

50. According to FE3, Plug delayed the Georgia plant's production to late 2023, finally starting in early 2024, which FE3 attributed to funding issues and insufficient infrastructure. FE3 also questioned where batteries were being produced since the Vista plant was not producing much. FE3 recalled sales announcements with major customers but doubted Plug could meet their commitments.

51. FE3 explained that operational challenges arose from slowed production and insufficient workload. FE3 also observed recurring equipment quality issues. Components were hastily assembled, resulting in problems such as leaking stacks. Rather than thoroughly inspecting the units, faulty parts were repeatedly replaced without adequate checks. According to FE3, the answer would be "just put another stack in." Quality issues persisted due to technical problems and insufficient procedures. Jodie McCaughey, Production Engineering Manager, opposed

verifying unit performance before assembly. FE3 pushed for inspections and closing purchase orders only after checks to prevent selling poor-quality products that could harm Plug's reputation.

52. FE3 recalled receiving orders from Stellantis; however, Plug could not meet the demands. Further, Plug Power did significant business with Amazon, selling units with full-life warranties. When some batteries failed, Plug retrieved them and supplied loaners, though most were unreliable. FE3 estimated that out of 1,000 units sold to Amazon, 200 would fail, and Plug lacked the capacity to replace all of them. In addition to the batteries, Plug also had manufacturing problems with its electrolyzers. FE3's team lead was present at the location where employees worked on the electrolyzers who observed numerous issues during assembly, which often required the team to reassemble components after failures. FE3 questioned whether Plug had the capacity to build electrolyzers. FE3 also noted there was no long-term testing conducted on the units. The electrolyzers consistently malfunctioned.

53. Former Employee 4 ("FE4") was previously employed at Plug as an Office Manager and Senior Administrative Assistant from June 2022 to August 2024 and reported to Noelle DiPietro, Manager Executive Administration and previously to Cortney Mittelsteadt, VP Electrolyzer Technology. FE4 worked at Plug's West Concord, Massachusetts, Electrolyzer Facility. FE4's job duties included managing office tasks, planning events, running the Success Program Manufacturer floor, onboarding new employees, and supporting vice presidents with updates and projects.

54. FE4 believed that CEO Marsh and CFO Middleton made promises about hydrogen production quantities from the Georgia and Tennessee plants that they could not keep. According to FE4, Mittelsteadt told both Marsh and Middleton their timeline was unrealistic. Mittelsteadt shared these concerns directly with FE4. Mittelsteadt also told FE4 that Plug's public hydrogen

production forecasts were highly unrealistic and unattainable. Mittelsteadt expressed no confidence in the figures, disagreed with Marsh, and openly challenged him on these issues, according to FE4. When discussing the Tennessee and Georgia projects with FE4, Mittelsteadt expressed no confidence in Plug and stated upon resigning that the Company was failing. FE4 said further that VP Monjid Hamdan and others shared these concerns, openly discussing them in meetings. Notwithstanding, during internal “Town Hall” style meetings, Marsh claimed that current operational problems would be resolved but the problems continued to remain unresolved. FE4 observed that the West Concord facility incurred costs shipping electrolyzers back and forth due to unresolved problems. Additionally, inexperienced engineers had to troubleshoot on site, resulting in downtime and lost business.

55. FE4 described ongoing issues at Plug’s West Concord facility stemming from primarily a lack of technical expertise and recurring assembly errors with electrolyzers, including incorrect sizes and hydrogen components. Many products failed engineering tests and needed troubleshooting. According to FE4, electrolyzers are complex, requiring millions of parts. VP of Engineering Monjid Hamden faced difficulties stemming from non-payments to vendors for these parts, which resulted in order fulfillment issues and continued past due notices up to the time when FE4 ended employment with Plug. The main challenge voiced by employees during monthly “success meetings,” which were attended by technical staff and management, was sourcing parts since electrolyzers required specific manufacturing methods and Plug needed vendors to supply key components.

56. Former Employee 5 (“FE5”) was previously employed at Plug as Director of Business Development-Stationary Storage from September 2021 to February 2024 and reported first to Daren Painer, Vice President of Sales-Stationary Power, and later, Jose Luis Crespo, then

Vice President of Global Sales and now Chief Security Officer. FE5's responsibilities encompassed the sale of large-scale hydrogen fuel cell systems, including working with Energy Vault to develop a Resilient Energy Center in Calistoga, California.

57. FE5's primary focus at Plug was executing a sale for the largest hydrogen fuel cell system in U.S. history with Energy Vault. Energy Vault was developing a Resilient Energy Center in Calistoga, California. FE5 said his project with Energy Vault was well behind schedule. Plug promised Energy Vault customer delivery that the Company knew was unattainable, as the hydrogen fuel cells had not even been designed at the point of sale. Instead, Plug sold an untested product before production began, starting design only after missing the promised delivery date to Energy Vault.

58. FE5 explained that Energy Vault remained with Plug despite complaints because Plug's product was the only large system available. FE5 added that overruns on cost were significant. FE5 asserted that Plug lacked the resources to design and deliver as promised because it lacked workforce and could not pay its vendors. FE5 raised concerns through reporting line but stated that management took no action.

59. Former Employee 6 ("FE6") was employed by Plug from June 2023 to March 2025. FE6 served as the Commercial Finance Manager before transitioning to Senior Product Manager - Product Analytics. While in Finance, FE6 reported to Jerry Cahill, VP of Finance, who reported directly to CFO Paul Middleton. FE6 also reported to Tony Sinkevich, VP of Finance. While Senior Product Manager, FE6 reported to Glen Benson, Senior Systems Engineer. FE6 had responsibilities in both finance and product strategy, including pricing strategy design, analytical tool development, cost reduction initiatives, and supply agreement management. FE6 worked with data using PowerBI, Vena, and SAP from Plug's ERP system. FE6 also focused on pricing value

propositions, tool strategies, cost road mapping, and product management.

60. FE6 explained that delays at the Georgia and Tennessee plants were due to quality and engineering issues. For example, FE6 described that production delays were attributable to substantial problems with the Cold Box (a core mechanical component used to liquify hydrogen production). FE6 said the team faced significant challenges getting the Cold Box operational at the Georgia plant. Additionally, Plug faced challenges with operation management control. The previous plants they opened prior to Georgia and Tennessee were developed as natural gas facilities, which differ significantly from building a hydrogen plant.

61. As time elapsed during construction, the scope of the Georgia plant project changed from the original plan but, according to FE6, Plug lacked the expertise to connect the Cold Box, which was challenging to assemble. Converting hydrogen gas to liquid for shipment proved difficult and Plug needed a suitable apparatus to facilitate liquefaction of the hydrogen. FE6 participated in internal leadership talks about the hydrogen production timeline. The discussions focused on how to achieve the required temperature to produce hydrogen, and what temperature they were currently on. FE6 described the process of trying to get to the right temperature as trial and error and believed that Plug was "in over their heads."

**D. Material Misstatements and Omissions**

62. Defendants knew or recklessly disregarded that the projected timeline was not feasible. The Georgia Plant was a core project at the center of Plug's vertical integration strategy and financial turnaround plan. As senior executives, the Individual Defendants were directly responsible for monitoring its progress, assessing its feasibility, and communicating accurate information to investors. Furthermore, the magnitude of the delay, more than half a year beyond the promised date, further supports the fact that Defendants knew or recklessly disregarded the

infeasibility of the timeline, especially given Plug's own acknowledgment of the industry-standard timeline of approximately four years and objections to the timeline voiced by other members of Plug's senior management, including VP Mittelsteadt and VP Monjid Hamdan. It was Defendants' core responsibility to track, predict, and disclose material developments at the Georgia Plant. By continuing to tout imminent production while omitting the fact that Georgia Plant remained far from complete, Defendants misled investors about both Plug's operational capabilities and its near-term margins in addition to other key financial metrics.[1]

<u>*1Q23 Quarterly Report*</u>

63. On May 9, 2023, Plug filed its quarterly report on Form 10-Q for the first quarter of fiscal 2023. Defendants Marsh and Middleton signed the report on behalf of Plug in their capacities as CEO and CFO, respectively.

64. In the Form 10-Q, Plug described "Recent Developments" relating to its business. Among the various "Recent Developments" listed in the Form 10-Q, Plug listed a section titled "Inflation, Material Availability and Labor Shortages" stating in pertinent part, that:

> Most components essential to our business are generally available from multiple sources; however, we believe there are some component suppliers and manufacturing vendors, particularly those that supply materials in very limited supply worldwide, whose loss to us could have a material adverse effect upon our business and financial condition. We are mitigating these potential risks by introducing alternate system architectures that we expect will allow us to diversify our supply chain with multiple fuel cell, electrolyzer stack and air supply component vendors. In addition, we continue to invest in our supply chain to improve its resilience with a focus on automation, dual sourcing of critical components and localized manufacturing when feasible. We are also working closely with these vendors and other key suppliers on coordinated product introduction plans, product and sales forecasting, strategic inventories, and internal and external manufacturing schedules and levels; however, changes to our products designs or incorrect forecasting could present challenges to those strategies despite

[1] Plaintiffs use italicized and bold typeface in this Section IV.D., *infra*, to denote false and/or misleading statements. Accompanying text appearing in original typeface (*i.e.*, not emphasized) is provided for context and is not alleged to be per se false or misleading.

> best efforts in leveraging supplier relationship and capabilities. Recent cost pressures from global energy prices and inflation have negatively impacted access to our key raw materials. In cases where we have single sourced suppliers (typically due to new technology and products) or there have been worldwide shortages due to global demand, we have worked to engineer alternatives in our product design or develop new supply sources while covering short- and medium-term risks with supply contracts, building up inventory, and development partnerships. However, if we, or the industry or economy at large, were to experience a recession and the demand for our product decreases, then we may have a large stock of pre-purchased inventory that could be unused and aging for a period of time.

65. The statements in the immediately preceding paragraph were false and/or materially misleading by omission. For all the information Defendants provided about the risks of potential supply and material shortages, they said nothing of the fact that Plug was actively experiencing shortages and, at that, due to not paying its suppliers. Consequently, the foregoing cautionary language in Plug's quarterly report misled investors by concealing active ongoing supply shortages caused by Plug's failure to timely pay suppliers. This information was not disclosed but instead concealed by portraying risks of supply shortages as hypothetical in nature and stemming from reasons not relating to Plug's then existing cash flow troubles. Had this information been disclosed, investors would have known that Plug's timeline for hydrogen production and operations were actively being impeded by its cash flow difficulties, which was highly material to the market.

*<u>1Q23 Press Release</u>*

66. On May 9, 2023, Plug issued a press release discussing its earnings for the first quarter of fiscal 2023. Defendants Marsh and Middleton signed the press release on behalf of the Company. In pertinent part, the press release contained the following information:

> ***Plug's Georgia Liquid Green Hydrogen Plant Will Complete Commissioning and Continue to Ramp to Liquid Production throughout Q2***: The plant has been brought online in less than a year since issuing the full EPC contract (engineering, procurement and construction contract), marking a new industry standard for the construction timeline of a liquid hydrogen plant.

. . .

***We expect to commission 200+ TPD by 4Q23 / 1Q24 and 500TPD by year-end 2025. Based on learnings in Georgia, presently it takes six months to get plants from commissioning to full production***. Plug's green hydrogen generation network buildout should accelerate the energy transition while driving meaningful margin enhancement for Plug. To clarify the impact of this strategy, with a forecasted full year average customer demand of 65 tons of hydrogen fuel delivered per day in 2023, Plug would be able to achieve $100 million of gross margin improvement annually by sourcing all hydrogen internally from our plant network. We expect further gross margin expansion toward our financial targets as additional green hydrogen plants come online in 2024 and beyond.

. . .

***Georgia: Plug has made significant strides in ramping up liquid hydrogen production, with plans to begin production in the second quarter of 2023***. In less than a year since the arrival of crews on site, Plug is set to launch the first green hydrogen production plant in the United States, breaking the industry standard timeline of 48 months. . . .







This plant represents a major achievement as Plug is turning on the first commercial

> scale green hydrogen plant in the United States. Learnings from the construction and commercial operations at Georgia are proving to be invaluable as Plug optimizes future plant design, progresses with prospective electrolyzer customers, and diligence with strategic partners.

(Emphasis added.)

67. The emphasized statements in the immediately preceding paragraph were false and/or materially misleading. Plug had been and continuing to experience delays at the Georgia Plant due to shortages of supplies and faulty mechanical components. Third-party suppliers had stopped providing materials to Plug because Plug was not paying them. Moreover, the mechanical equipment needed to successfully liquefy hydrogen gas was malfunctioning. Senior management within Plug discussed these issues with Defendants when objecting to the timelines being provided to public investors. Consequently, Defendants misled investors when claiming that the Georgia Plant was progressing as planned and that Plug would be producing 15 TPD during the second quarter when, in reality, that timeline was not feasible due to the obstacles Defendants were currently facing.

*1Q23 Conference Call*

68. On May 9, 2023, Plug held a conference call to discuss its first quarter earnings. Defendants Marsh, Middleton, and Shrestha participated in the call on behalf of the Company.

69. During opening remarks, Defendant Marsh told investors in pertinent part that:

> [O]ur plants already producing gases hydrogen for our customers, and ***we expected to achieve full production by the end of June.*** Although we always strive for greater speed, it's really worth noting, we accomplished what we've accomplished since issuing full notice to proceed under our EPC contract full production in just 48 weeks. This is a remarkable feat considering that conventional gas companies, and I was sitting at Syra, we've been listening to one CEO talking about 6 years, they usually estimate 4 years of a project of this scale.
>
> Additionally, ***by the end of June, our Georgia plant, with the largest green hydrogen play in the world that utilizes electrolyzers. That's a significant achievement.*** . . .

> One of the real competitive advantage is the infrastructure we've established in Rochester and Vista, which enables us to support our business growth. And our customers really do recognize our ability to deliver our promises, thanks to the tools and facilities we possess. ***Our ability to construct green hydrogen plants is evident in Georgia***, and we plan to further demonstrate this in Texas and New York, which will eliminate any doubts about our capabilities. I'm going to be walking Georgia today, I'm excited. . . .

(Emphasis added.)

70. The emphasized statements in the immediately preceding paragraph were false and/or materially misleading because they portrayed Plug's operations at the Georgia Plant in an unrealistic and overly optimistic light. Instead of truthfully disclosing that the Georgia Plant was behind schedule and at risk of not meeting its "end of June" production target, Marsh acted as if operations at the Georgia Plant were de-risked and proof positive of Plug's ability to produce liquid hydrogen. Consequently, Marsh's statements concealed the cash flow, supplier, and equipment issues currently plaguing the Georgia Plant that were actively impeding Plug's hydrogen production efforts.

*Analyst Day*

71. On June 14, 2023, Plug hosted an "Analyst Day" from its Gigafactory in Rochester, New York. Defendants Marsh and Middleton participated in the event on behalf of the Company.

72. Defendant Marsh made the following statements during his prepared remarks at the "Analyst Day" event:

> And I think most of you know, I usually don't say things like that, but it's really touched me this week. And I think part of that probably has to do, I was in Georgia this week. And I'm going to -- I was at a CERAWeek all in the early March probably with many of you. And at CERAWeek, there were lots of traditional fossil fuel companies and traditional hydrogen companies talking about it takes 4 to 5 years to build a hydrogen plant. ***So I'm walking Georgia with the Head of S&P. We're down there. I'm down there to thank them for everything they've done and to really kind of enjoyed looking at this 15-ton per day liquid hydrogen plant with electrolyzers where there's nothing like in the world. And we're going to have another Analyst Day down there in August because we really want to bring you to Georgia in August.***

> ***And I walk that plan[t] and people tell me the experts told me it couldn't be done.*** . . .
>
> ***So the important item is Georgia will be putting out liquid at the end of the month, and I can't wait***.

(Emphasis added.)

73. The emphasized statements in the immediately preceding paragraph were false and/or materially misleading. At the time these statements were made, critical construction and commissioning steps at the Georgia Plant remained incomplete. These statements were materially misleading because it assured investors that full production by June 2023 was imminent when, in fact, the plant would not begin producing liquid hydrogen until January 2024, seven months later. Whenever Defendants spoke about the Georgia Plant, they failed to mention any potential setbacks or risks of delay, despite the obvious likelihood of such problems given the compressed schedule.

74. Instead, Defendants highlighted Plug's supposed ability to meet its promises and execute faster than industry norms, while at the same time touting the Company's "strong balance sheet." In truth, Plug was struggling to pay contractors and vendors on time which is an issue that contributed to delays at the Georgia Plant. These omissions rendered Defendants' assurances materially false and misleading. Moreover, Defendant Marsh admitted that industry experts had told him the project could not be completed on the accelerated timeline, yet he nevertheless continued to assure investors that production would occur by the end of June 2023. These omissions and misstatements rendered Defendants' assurances materially false and misleading. The timeline was presented without qualification or disclosure of risks, and was drastically shorter than the acknowledged four-year industry standard for completing comparable facilities.

<u>*2Q23 Quarterly Report*</u>

75. On August 9, 2023, Plug filed its quarterly report on Form 10-Q for the second quarter of fiscal 2023. Defendants Marsh and Middleton signed the report on behalf of Plug in

their capacities as CEO and CFO, respectively.

76. In the Form 10-Q, Plug described "Recent Developments" relating to its business. Among the various "Recent Developments" listed in the Form 10-Q, Plug listed a section titled "Inflation, Material Availability and Labor Shortages" stating in pertinent part, that:

> Most components essential to our business are generally available from multiple sources; however, we believe there are some component suppliers and manufacturing vendors, particularly those suppliers and vendors that supply materials in very limited supply worldwide or supply commodities that have high degree of volatility, whose loss to us or general unavailability could have a material adverse effect upon our business and financial condition. Furthermore, global commodity pricing is very volatile and influenced by political events and worldwide economic trends, which may impact our sourcing strategies resulting in adverse impacts on our business and financial condition. We are mitigating these potential risks by introducing alternate system architectures that we expect will allow us to diversify our supply chain with multiple fuel cell, electrolyzer stack and air supply component vendors. In addition, we continue to invest in our supply chain to improve its resilience with a focus on automation, dual sourcing of critical components and localized manufacturing when feasible. We are also working closely with these vendors and other key suppliers on coordinated product introduction plans, product and sales forecasting, strategic inventories, and internal and external manufacturing schedules and levels; however, changes to our products designs, new product serviceability trends, or incorrect forecasting could present challenges to those strategies despite best efforts in leveraging supplier relationship and capabilities. Recent cost pressures from global energy prices and inflation have negatively impacted access to our key raw materials. Additionally, our regionally diverse supply chain could result in price shifts from one region to another region that may affect our costs and strategic initiatives. In cases where we have single sourced suppliers (typically due to new technology and products or worldwide shortages due to global demand), we work to engineer alternatives in our product design or develop new supply sources while covering short- and medium-term risks with supply contracts, building up inventory, and development partnerships. However, if we, or the industry or economy at large, were to experience a recession, then we may have a large stock of pre-purchased inventory that could be unused and aging for a period of time. We continue to take proactive steps through our supply chain team to limit the impact of suppliers challenges generally and we continue to work closely with our suppliers and transportation vendors to ensure availability of products and implement other cost savings initiatives.

77. The statements in the immediately preceding paragraph were false and/or materially misleading by omission. For all the information Defendants provided about the risks of

potential supply and material shortages, they said nothing of the fact that Plug was actively experiencing shortages and, at that, due to not paying its suppliers. Consequently, the foregoing cautionary language in Plug's quarterly report misled investors by concealing active ongoing supply shortages caused by Plug's failure to timely pay suppliers. This information was not disclosed but instead concealed by portraying risks of supply shortages as hypothetical in nature and stemming from reasons not relating to Plug's then existing cash flow troubles. Had this information been disclosed, investors would have known that Plug's timeline for hydrogen production and operations were actively being impeded by its cash flow difficulties, which was highly material to the market.

<u>*2Q23 Press Release*</u>

78. On August 9, 2023, Plug issued a press release discussing its earnings for the second quarter of fiscal 2023. Defendants Marsh and Middleton signed the press release on behalf of the Company. In pertinent part, the press release contained the following information

> Plug's Georgia green hydrogen plant reaching major milestone: We are continuing to optimize and ramp-up the plant. ***Final commissioning activities are underway to reach 17.5 tons per day (TPD) of production on site during Q3 2023.*** As Georgia produces at its full capacity, this is expected to cut our fuel margin loss by as much as half from Q2 to Q4 2023. . . . ***As production from our Georgia plant is utilized in the 2H 23, and we recommission the hydrogen plant currently under unplanned maintenance, we should see notable improvement in fuel margin beginning in the second half of the year***.

(Emphasis added.)

79. The emphasized statements in the immediately preceding paragraph were false and/or materially misleading. Plug had been and continuing to experience delays at the Georgia Plant due to shortages of supplies and faulty mechanical components. Third-party suppliers had stopped providing materials to Plug because Plug was not paying them. Moreover, the mechanical equipment needed to successfully liquefy hydrogen gas was malfunctioning. Senior management

within Plug discussed these issues with Defendants when objecting to the timelines being provided to public investors. Consequently, Defendants misled investors when claiming that the Georgia Plant was progressing as planned and that Plug would be producing 17.5 TPD during the third quarter when, in reality, that timeline was not feasible due to the obstacles Defendants were currently facing.

*2Q23 Conference Call*

80. On August 9, 2023, Plug held a conference call to discuss its second quarter earnings. Defendants Marsh, Middleton, and Shrestha participated in the call on behalf of the Company.

81. After missing the June 2023 deadline without providing any substantive explanation, during Plug's second quarter earnings call, Defendants continued to assure investors that production was imminent. In particular, Defendant Shrestha stated:

> So again, I think we're fairly -- look, ***we feel very confident that we're going to be producing liquid in Q3. Right now, we're essentially going through ramping up electrolyzer, right? We've actually tried to electrolyze this one. You know that we've been producing gaseous hydrogen there with our gaseous hydrogen plant. We're in a process of actually ramping up our liquefiers in a process of cooling down the liquefaction trains.***
>
> So again, that's why we're hosting our Analyst Day there on August 23, right, so that we can actually show to you all exactly what's happening there and what's going on. So at the moment here, are we producing liquid? ***We're not producing liquid today, but we are essentially ramping up the electrolyzer on path to be able to produce that liquid.*** And Jeff, one of the key things here, right, I do want to stress this one particular point is, obviously, look, and I'm just going to take the point that's an elephant in the room, if you would. We clearly recognize that we've been 3 to 6 months behind than what we originally wanted it to be. But having said that, this plant is still coming online in 12 months since we actually issued the EPC contract, number one.
>
> . . . ***So long story and a quick comment, we are going to be producing liquid here in the month of August.*** We're very much looking forward to hosting you all on August 23, and we're essentially wrapping up the plant at this point in time.
>
> . . .

> And again, one of the things we want to make sure, right? So for us, getting Georgia up and running and getting production in Georgia, it also has to be done the right way and really leverage that learning as we start to think about building our plant in Texas, as we're building our plant in New York as well, right? So that's essentially what I would say. And also, another thing you need to kind of keep in mind, right, is we've been pushing just so you guys know, in order to be able to get this plant built in 12 months versus what the industry average of 48 months is, we've actually been pushing folks, but it's the month of July and August.
>
> And on some level, the productivity does go down because it's 100 degrees outside and people have to actually take break and really be able to cool down and then go back on site. And just to give you a sense, the team was on site at 4:30 a.m. today, right, just to make sure that things were happening. So that's another factor. There's nothing anyone can really do about that, reduce productivity in the month of June, July and August in Georgia, and that certainly has played a bit of an impact here as well. . . .

(Emphasis added.)

82. The emphasized statements in the immediately preceding paragraph were false and/or materially misleading. At the time these statements were made, critical construction and commissioning steps at the Georgia Plant remained incomplete. Defendants' statements not only attributed the delay to summer heat and utilizing learnings, something they should have foreseen or accounted for with all the experts on the project, but also falsely suggested that full production was only weeks away and subsequently completed when in reality the facility did not begin producing liquid hydrogen until January 2024, seven months later. Furthermore, this timeline was presented without qualification of disclosure of risks or setbacks and was drastically shorter than industry norm for completing comparable facilities.

*Analyst Day*

83. On August 23, 2023, Plug hosted an "Analyst Day" event in person in Georgia to discuss the Company's Georgia Plant. Defendants Marsh and Shrestha participated in the event on behalf of the Company.

84. In advance of the event, Plug issued a press release stating, in pertinent part, that:

> LATHAM, N.Y., Aug. 23, 2023 (GLOBENEWSWIRE) -- Plug Power Inc.

> (NASDAQ: PLUG), a global leader in comprehensive hydrogen solutions for the green hydrogen economy, today will host its Analyst Day ***showcasing the accomplishments to date of its 15 ton per day (TPD) liquid green hydrogen plant in Camden County, Georgia.*** Plug will share how the Georgia plant strengthens Plug's long-term position as the global leader in green hydrogen production and supplier of electrolyzers. The day's agenda will include a tour of the hydrogen plant.
>
> . . .
>
> The insights Plug gained designing and constructing this plant are expected to result in design optimization and lower capital expenditure for the company's other plants currently under construction. ***As the Georgia plant's hydrogen production ramps up, it is anticipated to improve Plug's fuel margin meaningfully from Q2 to Q4 2023.***

(Emphasis added.)

85. During the presentation, Plug provided a slide claiming that the Georgia plant would "cut our fuel margin loss by as much as half from Q2 to Q4 2023." The slide is below:




86. The emphasized statements and slide in the immediately preceding paragraphs were false and/or materially misleading. The Georgia Plant was not actively producing 15 TPD of hydrogen but instead was continuing to experience delays due to shortages of supplies and faulty

mechanical components. Third-party suppliers had stopped providing materials to Plug because Plug was not paying them. Moreover, the mechanical equipment needed to successfully liquefy hydrogen gas was malfunctioning. Senior management within Plug discussed these issues with Defendants when objecting to the timelines being provided to public investors. Consequently, Defendants misled investors when claiming that the Georgia Plant was progressing as planned and that Plug would be successfully cutting its margin losses before year-end when, in reality, that timeline was not feasible due to the obstacles Defendants were currently facing.

*Annual Symposium*

87. On October 11, 2023, Plug hosted its fifth annual symposium in person at its Vista manufacturing facility in Slingerlands, New York. During the symposium, various Plug executives presented on the Company's operations, including its efforts to generate hydrogen.

88. During the event, Defendant Marsh again reassured investors that completion of the Georgia Plant was imminent, stating in pertinent part as follows:

> And on hydrogen, in 2020, we had nothing. There's dream. I went back and look at 2020 slides, which when I look at and found out we're beating -- the 2019 slides, we're beating the numbers. We told folks where we're going to be in 2019. I think we said we were going to be $1 billion of revenue in 2024. We're going to do that this year. But also, we talked about -- we're thinking about how we would build hydrogen plants. We have a plant in Tennessee. ***I wish I could tell you, Georgia was putting out liquid today, somewhere between 11/15 and 12/31, when the coal [sic] boxes – coal [sic] box is finally commissioned, where we're going through a process now of drying it out.*** It's a $100 million piece of equipment. We really want to make sure it's done right. But that work is about to be completed. It's the biggest electrolyzer plant in the world.
>
> We've learned, and it's -- every day, I learn a little bit more, we had to test 8,000 pipes in this facility. We had to test 3,000 electrical loops to make sure everything was right. We're drying out coal boxes. ***It hasn't been easy, but I can tell you, Sanjay, myself, Tim Cortes, have become experts in what it takes to build, which is the easy part, and really what it takes to commission***.

(Emphasis added.)

89. The emphasized statements in the immediately preceding paragraph was materially misleading. By the time these statements were made, Plug had already missed both the June 2023 deadline and its subsequent August 2023 assurances, yet Defendants failed to disclose that these earlier targets had been unattainable from the start. Instead, Defendants shifted their timeline once again, presenting the project as in its final steps and on track for year-end completion. In truth, critical commissioning remained unfinished, and the Georgia Plant did not begin producing liquid hydrogen until January 2024, seven months past the original deadline and even beyond Defendants' revised August 2023 and year-end promises. By continuing to provide moving targets without acknowledging the infeasibility of the compressed schedule, Defendants misled investors into believing Plug's aggressive timeline remained credible when it was not.

*3Q23 Quarterly Report*

90. On November 9, 2023, Plug filed its quarterly report on Form 10-Q for the third quarter of fiscal 2023. Defendants Marsh and Middleton signed the report on behalf of Plug in their capacities as CEO and CFO, respectively.

91. In the Form 10-Q, Plug described "Recent Developments" relating to its business. Among the various "Recent Developments" listed in the Form 10-Q, Plug listed a section titled "Inflation, Material Availability and Labor Shortages" stating in pertinent part, that:

> Most components essential to our business are generally available from multiple sources; however, we believe there are some component suppliers and manufacturing vendors, particularly those suppliers and vendors that supply materials in very limited supply worldwide or supply commodities that have high degree of volatility, whose loss to us or general unavailability could have a material adverse effect upon our business and financial condition. Furthermore, global commodity pricing has been volatile and may be influenced by political events and worldwide economic trends, which may impact our sourcing strategies resulting in adverse impacts on our business and financial condition. We are mitigating these potential risks by introducing alternate system architectures that we expect will allow us to diversify our supply chain with multiple fuel cell, electrolyzer stack and air supply component vendors. For example, although we believe the current

> hydrogen supply challenge is a transitory issue, we have experienced supply chain issues relating to the availability of hydrogen, including but not limited to suppliers utilizing force majeure provisions under existing contracts, which has negatively impacted the amount of hydrogen we have been able to provide under certain of our supply and other agreements. In addition, we continue to invest in our supply chain to improve its resilience with a focus on automation, dual sourcing of critical components and localized manufacturing when feasible. We are also working closely with these vendors and other key suppliers on coordinated product introduction plans, product and sales forecasting, strategic inventories, and internal and external manufacturing schedules and levels. However, ongoing changes to, and evolution of, our products designs such as simultaneous design/build efforts and new product serviceability trends, or incorrect forecasting or updates to previously forecasted volumes could present challenges to those strategies despite best efforts in leveraging supplier relationships and capabilities. With respect to production, although we have experienced less cost pressures from global energy prices and inflation, those factors could rise again and there could be a negative impact to our key raw materials. Additionally, our regionally diverse supply chain could result in price shifts from one region to another region that may affect our costs and strategic initiatives. In cases where we have single sourced suppliers (typically due to new technology and products or worldwide shortages due to global demand), we work to engineer alternatives in our product design or develop new supply sources while covering short- and medium-term risks with supply contracts, building up inventory, and development partnerships. However, if we, or the industry or economy at large, were to experience a recession, then we may have a large stock of pre-purchased inventory that could be unused and aging for a period of time. In addition, during the fourth quarter of 2023, we are continuing discussions with suppliers to modify terms of our supply agreements, which may impact the timing of when we receive shipments of certain supplies or result in other supply chain issues. However, we continue to take proactive steps through our supply chain team to limit the impact of suppliers challenges generally and we continue to work closely with our suppliers and transportation vendors to ensure availability of products and implement other cost savings initiatives. With respect to its service business, the Company has experienced inflationary increases in labor, parts and related overhead. Accordingly, the Company increased its estimated projected costs to service fuel cell systems and related infrastructure, which resulted in an increase in the provision for loss contracts related to service during the third quarter of 2023. If these trends continue, we may have to record additional service loss provisions in the future. We anticipate bookings and revenue will be uneven in the near-term while we pursue sales opportunities and seek to build our liquefier backlog.

92. The statements in the immediately preceding paragraph were false and/or materially misleading by omission. For all the information Defendants provided about the risks of potential supply and material shortages, they said nothing of the fact that Plug was actively

experiencing shortages and, at that, due to not paying its suppliers. Consequently, the foregoing cautionary language in Plug's quarterly report misled investors by concealing active ongoing supply shortages caused by Plug's failure to timely pay suppliers. This information was not disclosed but instead concealed by portraying risks of supply shortages as hypothetical in nature and stemming from reasons not relating to Plug's then existing cash flow troubles. Had this information been disclosed, investors would have known that Plug's timeline for hydrogen production and operations were actively being impeded by its cash flow difficulties, which was highly material to the market.

*3Q23 Press Release*

93. On November 9, 2023, Plug issued a press release discussing its earnings for the third quarter of fiscal 2023. Defendants Marsh and Middleton signed the press release on behalf of the Company. In pertinent part, the press release contained the following information:

> Georgia green hydrogen plant nearing major milestone: ***We are completing the final step of the commissioning process for the liquefiers/cold box. Liquid production is anticipated between November 15th and year-end.***

94. The emphasized statements in the immediately preceding paragraph was materially misleading. By the time these statements were made, Plug had already missed both the June 2023 deadline and its subsequent August 2023 assurances, yet Defendants failed to disclose that these earlier targets had been unattainable from the start. Instead, Defendants shifted their timeline once again, presenting the project as in its final steps and on track for year-end completion. In truth, critical commissioning remained unfinished, and the Georgia Plant did not begin producing liquid hydrogen until January 2024, seven months past the original deadline and even beyond Defendants' revised August 2023 and year-end promises. By continuing to provide moving targets without acknowledging the infeasibility of the compressed schedule, Defendants misled investors into believing Plug's aggressive timeline remained credible when it was not.

*3Q23 Conference Call*

95. On November 9, 2023, Plug held a conference call to discuss its third quarter earnings. Defendants Marsh, Middleton, and Shrestha participated in the call on behalf of the Company.

96. During the call, Defendant Marsh stated in pertinent part, that:

> To service our customers, Plug has been moving hydrogen from the West Coast to the East Coast. This has been a yeoman's effort and has been accomplished while reducing the core cost of hydrogen compared to the second quarter. Good news is the network has now stabilized and many of these planned outages have subsided, plus additional capacity will be coming online. We expect our Tennessee plant will be back online producing hydrogen by the end of the year.
>
> This plant when fully operational provides about 20% of our production needs. One of our major suppliers is upgrading one of their facilities to allow the plant to operate at full nameplate capacity in the coming months. The plant output has been producing between 0% to 25% of capacity. ***We are continuing to see progress at our Georgia plant, and we are finishing the last step in the construction process, commissioning the liquefier. We expect the plant to be online by year-end.***

97. The emphasized statements in the immediately preceding paragraph was materially misleading. By the time these statements were made, Plug had already missed both the June 2023 deadline and its subsequent August 2023 assurances, yet Defendants failed to disclose that these earlier targets had been unattainable from the start. Instead, Defendants shifted their timeline once again, presenting the project as in its final steps and on track for year-end completion. In truth, critical commissioning remained unfinished, and the Georgia Plant did not begin producing liquid hydrogen until January 2024, seven months past the original deadline and even beyond Defendants' revised August 2023 and year-end promises. By continuing to provide moving targets without acknowledging the infeasibility of the compressed schedule, Defendants misled investors into believing Plug's aggressive timeline remained credible when it was not.

### E. Corrective Disclosures, Loss Causation and Economic Loss

98. During the Class Period, as detailed herein, Plug and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Plug's securities and operated as a fraud or deceit on Class Period purchasers of Plug securities by materially misleading the investing public. Later, when Plug and the defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Plug's securities materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Plug securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

99. On August 9, 2023, during Plug's second quarter earnings call, it was clear that the Georgia Plant has not been completed by the second quarter as originally touted by Plug. Instead, Plug announced that "***we are going to be producing liquid here in the month of August.*** We're very much looking forward to hosting you all on ***August 23***, and we're essentially wrapping up the plant at this point in time." Plug disclosed $45 million in startup and maintenance costs, leading to adjusted EPS/EBITDA of negative $0.37/share and negative $171.5 million compared to analyst estimates of negative $0.27 per share and negative $87.3 million.

100. On August 9, 2023, Plug's stock price closed at $10.75 per share. On August 10, 2023, Plug's stock price closed at $9.05 per share on unusually high volume (69,407,194). Between August 9, 2023 and August 10, 2023, Plug's stock price dropped approximately 15.8%. The approximate 15.8% decline in Plug's stock price coincides with and is attributable to Plug's inadvertent disclosure in its August 2023 earnings call, after the market opened, that it failed to meet its June 2023 deadline for the completion of its Georgia Plant. As the market interpreted and evaluated the Company's disclosures in the days that followed, Plug's stock price continued to decline.

101. On November 9, 2023, after missing both its June 2023 and August 2023 deadlines, Plug announced: "We are completing the final step of the commissioning process for the liquefiers/cold box. Liquid production [at the Georgia Plant] is anticipated ***between November 15th and year-end.***" Plug's quarterly report include a going concern qualification alongside significant misses on adjusted EPS and EBITDA (-$0.45 vs. -$0.31 and -$204m vs. -$128m).

102. On November 9, 2023, Plug's stock price closed at $5.93 per share. On November 10, 2023, Plug's stock price closed at $3.53 per share on unusually high volume (223,395,250). Between November 9, 2023, and November 10, 2023, Plug's stock price dropped approximately 40.5%. As the market interpreted and evaluated the Company's disclosures in the days that followed, Plug's stock price declined sharply. The approximate 40.5%. decline in Plug's stock price coincides with and is attributable to Plug's disclosure that it had failed to meet both the June 2023 and August 2023 deadline for the completion of the Georgia Plant and that now the Georgia Plant was anticipated to be completed between November 15, 2023 and year-end.

103. On November 16, 2023 and January 10, 2024, analysts at J.P. Morgan and Baptista Research (among others) issued reports on Plug voicing concerns over Plug's cash burn and inability to produce hydrogen, including at Georgia Plant. Specifically, on November 16, 2023, J.P. Morgan issued a report after meeting with Defendant Middleton "to discuss the company's outlook post-3Q earnings, options to strengthen its balance sheet, and path for margin improvement." J.P. Morgan highlighted in its report that the Georgia Plant was still not operational and would need to commence operations before Plug's margins could being improving. On November 15, 2023, Plug's stock price closed at $4.35/share before declining to $3.87/share on November 20, 2023.

104. On January 10, 2024, Baptista Research wrote that "The delays experienced in the Georgia facility indicate that there might be unforeseen operational challenges and learning curves that

could potentially delay other projects, affecting the company's short-term production and revenue targets." On January 10, 2024, Plug's stock price closed at $4.04/share before declining to $2.42/share on January 18, 2024. These declines were causally related to the Defendants' misrepresentations and omissions; indeed, inflation in the stock price dissipated as new information entering the market and revealing Plug's operations to be further behind schedule than previously represented.

105. On January 17, 2024, *Seeking Alpha* published a report reiterating the downgrades and build-out concerns, including a report released by Morgan Stanley earlier that day and noting that "Morgan Stanley analyst Andrew Percoco maintained his Underweight rating and $3 price target, anticipating downside to Plug's (PLUG) $2.1B revenue and 25% gross margin guidance for FY 2024 announced during its Q4 earnings call" and that "further delays at Plug's green hydrogen production facility in Georgia could be announced, which would add to pressure on the growth and profitability profile of the company's green hydrogen business model." By this point in time, Plug's stock price had fallen to $2.74/share (compared to intra-class period highs of about $13.25/share in mid-2023).

106. Defendants initially touted a June 2023 completion date for the Georgia Plant, but when that deadline passed unmet, Plug's stock price declined. Defendants then announced a revised completion date of August 2023, which likewise went unmet, prompting yet another postponement and further stock price decline. In sum, Defendants' concealment of risks and delays surrounding the Georgia Plant misled investors and caused substantial losses. It was not until January 23, 2024, seven months from the originally promised date, that Plug finally announced the completion of the Georgia Plant in a press release. To analysts and investors, Plug and its executive management had already lost credibility by this point, as noted by Seaport Research Partners on February 6, 2024. In pertinent part, Seaport Research wrote that: "Downgrading to Neutral: triage and then rehab to be a lengthy process; we'll be waiting for stronger vital signs on profitability . . . . In this stage, we believe PLUG should

focus on rebuilding its business model and guidance credibility and, as the central thrust of that mission, demonstrating progress toward profitability."

**F. Scienter Allegations in Support of Exchange Act Violations**

107. Collectively, the above and following factual allegations strongly support an inference of scienter on the part of Defendants. Further, Defendants' actions, intentions, and deliberately reckless conduct are imputed to the Company as a matter of law. Because of their key roles in the Company, the Individual Defendants caused Plug to act in the manner it did and perpetuate the material misrepresentations and omissions it made throughout the Class Period. Defendants acted with the requisite intent to establish liability under the Exchange Act.

*Direct Knowledge of the Georgia Plant's Status*

108. Defendants had direct knowledge of the Georgia Plant's progress. On multiple occasions, Defendant Marsh publicly stated that he personally visited the facility to monitor its construction and commissioning. For example, on June 14, 2023, Defendant Marsh stated:

> And I think most of you know, I usually don't say things like that, but it's really touched me this week. And I think part of that probably has to do, ***I was in Georgia this week.*** And I'm going to -- I was at a CERAWeek all in the early March probably with many of you. And at CERAWeek, there were lots of traditional fossil fuel companies and traditional hydrogen companies talking about it takes 4 to 5 years to build a hydrogen plant. ***So I'm walking Georgia with the Head of S&P. We're down there. I'm down there to thank them for everything they've done and to really kind of enjoyed looking at this 15-ton per day liquid hydrogen plant with electrolyzers where there's nothing like in the world. And we're going to have another Analyst Day down there in August because we really want to bring you to Georgia in August.***
>
> . . .
>
> ***So the important item is Georgia will be putting out liquid at the end of the month, and I can't wait***.

109. On June 16, 2023, in a company conference presentation, Defendant Marsh again emphasized his personal oversight of the project, stating:

> But -- so one of the things we've done is, today, we've looked at the oil and gas industry. And if -- how you execute on big projects and our plant in Georgia***, if you really look at who's building our plants in Georgia, guys who worked for BP and Shell, big companies who know how to build plants.***
>
> And that plant, ***I was at there Monday.*** And it took 500,000 hours of construction time to build that first plant. And that's something Plug never has done before. So we went out. If you look at the team we brought in the Netherlands and India, they all were from the oil and gas industry. You go down to [ Houston ] and they're all already in oil and gas industry.

110. In the same presentation, Marsh also highlighted that Plug had hired former BP and Shell engineers with "big project" experience to oversee construction, portraying the Georgia Plant as professionally managed and implying that Defendants had reliable, real-time information about its status and that these professionals knew how to build the plants.

111. Furthermore, Marsh admitted during Plug's June 14, 2023 "Analyst Day" event that industry experts had told him the Georgia Plant could not be built on the accelerated schedule Plug was promising. Marsh stated:

> ***And I walk that plan[t] and people tell me the experts told me it couldn't be done.*** And so I step back and I'm talking to ***a CEO,*** a great guy, and says to me, what we're really proud of is this plan is how we partner with Plug. We've put 500,000 hours in constructing this plant. We've been around for 50 years. It is the first time we ever had a deployment where we had no recordable injuries. When you talk to the old pros in this industry, are supposedly pros, they'll tell you that's one of the reasons this can't be done. But Plug because we partner and work with people was able to do it.

112. These admissions establish that Defendants were not distant executives relying on secondhand reports. To the contrary, they were on the ground, personally touring the facility, meeting with contractors and professionals, and promoting their close involvement to investors. In addition, as described by FE4, Mittelsteadt told both Marsh and Middleton their timelines and targets for hydrogen production at the Georgia Plant was unrealistic. Other executives voiced similar objections to Defendants' public statements about the Georgia Plant and Plug's ability to produce hydrogen internally, including VP Monjid Hamdan. Given this direct knowledge, Defendants either

knew or were deliberately reckless in representing that the plant would produce liquid hydrogen by June 2023.

113. Defendants provided investors with progress reports and promises concerning the Georgia Plant's supposed imminent production of hydrogen that consistently failed to materialize. Given the facts that existed when Defendants made these statements, they either intentionally misled investors or acted with deliberate recklessness. Specifically, Plug's critical cash flow shortages interfered with the Company's ability to obtain necessary components for construction and commissioning at the Georgia Plant which, in turn, delayed the successful producing liquid hydrogen. Defendant Marsh and other Plug executives knew this based on the routine in-person visits they made to the Georgia Plant, where they witnessed the factory *not* producing liquid hydrogen at levels necessary to support the 15 TPD targets they provided to the public.

*Core Operations and Magnitude of Delays*

114. The Georgia Plant was not a marginal project; it was a core component of Plug's business model and strategy. Plug repeatedly identified the Georgia Plant as essential to achieving vertical integration, reducing negative fuel margins, and demonstrating the viability of its green hydrogen build-out. The Company also emphasized that the Georgia Plant would serve as the template for additional facilities in Texas and New York.

115. Because of its centrality, the Individual Defendants, as Plug's executive officers, had a duty to monitor and accurately disclose the project's progress.

116. Defendants were also aware of financial and operational challenges within Plug that made timely completion of the Georgia Plant even less plausible. As explained by the former employee allegations above, Plug frequently failed to make timely payments to vendors and contractors, which delayed the delivery of critical parts. These facts, known internally, meant that

construction and commissioning of the Georgia Plant were likely hindered by funding and procurement issues that Defendants never disclosed. By discussing the Georgia Plant in the manner they did without also disclosing the delays caused by these funding issues, Defendants either intentionally misled investors or do so with deliberate recklessness.

117. The magnitude of the delay also supports scienter. Defendants promised that the Georgia Plant would begin producing liquid hydrogen by second quarter of 2023, yet the plant did not commence production until January 2024, nearly seven months later. A delay of this length, in a project of such significance, could not plausibly have escaped the attention of senior management, and if it did, it would have been severely reckless of senior management.

**G. Presumption of Reliance; Fraud-on-the-Market**

118. At all relevant times, the market for Plug's common stock was an efficient market for the following reasons, among others:

(a) Plug's common stock met the requirements for listing and was listed and actively traded on Nasdaq, a highly efficient and automated market;

(b) Plug communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Plug was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Plug was reflected in and incorporated into the Company's stock price during the Class Period.

119. As a result of the foregoing, the market for Plug common stock promptly digested current information regarding Plug from all publicly available sources and reflected such information in Plug's stock price. Under these circumstances, all purchasers of Plug's common stock during the Class Period suffered similar injury through their purchase of Plug's common stock at artificially inflated prices, and a presumption of reliance applies.

120. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's true net income and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in Plug.

**H. No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine**

121. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

122. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

123. The defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Plug who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## V. CLASS ALLEGATIONS

124. Plaintiffs bring this action on behalf of all individuals and entities who purchased or otherwise acquired Plug common stock during the Class Period, including acquisitions through the sale of put options and related assignments, and were damaged thereby (the "Class"). Excluded from the Class are Defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of Defendants have or had a controlling interest.

125. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Plug securities were actively traded on Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Plug or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

As of February 27, 2024, Plug had 684,255,083 shares of common stock outstanding. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

126. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

127. Plaintiffs have and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

128. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

(b) whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c) whether the price of Plug securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

(d) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

129. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Against All Defendants**

**Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

130. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

131. During the Class Period, Defendants knowingly or recklessly made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Such statements were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Plug common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Plug securities at artificially inflated prices. In furtherance of this unlawful course of conduct, Defendants, and each of them, took the actions set forth herein.

132. Pursuant to the above course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Plug's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

133. By virtue of their day-to-day responsibilities, participation in the senior management of Plug, and positions held at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to each Defendant. At all relevant times, Defendants had access to information contradicting their public statements to investors. Their misrepresentations and omissions were committed willfully or with reckless disregard for the truth.

134. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Plug's internal affairs.

135. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Plug's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, press releases and public statements, the market price of Plug's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Plug's common stock at artificially

inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants and were damaged thereby.

136. During the Class Period, Plug's common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Plug's common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Plug's common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Plug's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

137. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, and acquisitions of Plug's common stock during the Class Period.

138. By reason of the conduct alleged herein, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. This action was filed within two years of discovery of fraud or deceit and within five year of each Plaintiff's purchases or acquisitions of Plug securities giving rise to the cause of action.

**COUNT II**

**Against the Individual Defendants**

**Violations of Section 20(a) of the Exchange Act**

139. Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

140. During the Class Period, the Individual Defendants participated in the operation and management of Plug, and conducted and participated, directly and indirectly, in the conduct of Plug's business affairs. Because of their senior positions, they knew the adverse non-public information about Plug's operations.

141. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect Plug's financial condition and results of operations, and to correct promptly any public statements issued by Plug that had become materially false or misleading.

142. Because of their positions of control and authority as senior officers, Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Plug disseminated in the marketplace during the Class Period concerning Plug's operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Plug to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Plug within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Plug securities.

143. Each of the Individual Defendants, therefore, acted as a controlling person of Plug. By reason of their senior management positions and/or being directors of Plug, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Plug

to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Plug and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

144. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Plug.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a) Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Federal Rule of Civil Procedure 23 and Plaintiffs' counsel as Class Counsel;

(b) Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against the defendants for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## VII. JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: August 25, 2025

**POMERANTZ LLP**

/s/ Tamar A. Weinrib
Tamar A. Weinrib (Bar Roll No. 705932)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
taweinrib@pomlaw.com

*Attorneys for Lead Plaintiffs David Bruder and Randy Slipher and Lead Counsel for the Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**

Peretz Bronstein (*pro hac vice application forthcoming*)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for David Bruder*

**LEVI & KORSINSKY, LLP**

Adam M. Apton (*admitted pro hac vice*)
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Additional Named Plaintiffs Scott Keenan and Jose Martinez*