**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**IN RE PLUG POWER INC. SECURITIES**
**LITIGATION**

**No. 1:24-cv-00406 (MAD/DJS)**

**THIS DOCUMENT RELATES TO: ALL ACTIONS**

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION**
**COMPLAINT**

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................................. 1

II.   STATEMENT OF FACTS .................................................................................................. 3

  A.  Background ...................................................................................................................... 3

  B.  Defendants' False and Misleading Statements .................................................................. 4

  C.  The Truth is Revealed .................................................................................................... 6

III.   ARGUMENT ....................................................................................................................... 7

  A.  Applicable Standards ...................................................................................................... 7

  B.  The AC Adequately Alleges Misleading Statements and Omissions................................ 8

     1)   The PSLRA Safe Harbor Does Not Apply ..................................................................... 9

     2)   Defendants' Misstatements Are Not Inactionable Opinion ........................................... 12

     3)   Defendants' Risk Disclosures Regarding Supply and Material Shortages Are
    Actionable .......................................................................................................................... 14

  C.  The AC Adequately Alleges Scienter ............................................................................ 16

     1)   Defendants' Actual Knowledge Demonstrates Scienter .............................................. 17

     2)   The Magnitude of the Delay Supports the Inference of Scienter ................................. 21

     3)   The Core Operations Doctrine Supports the Inference of Scienter ............................. 22

     4)   There is No Credible Alternative Inference .................................................................. 23

     5)   The AC Adequately Alleges Corporate Scienter .......................................................... 23

  D.  The AC Adequately Alleges Loss Causation for All Misstatements............................... 23

  E.  The AC Adequately Alleges Control Person Liability ...................................................... 25

IV.   CONCLUSION................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*380544 Can., Inc. v. Aspen Tech., Inc.*,
  544 F. Supp. 2d 199 (S.D.N.Y. 2008)........................................................................................25

*Abramson v. Newlink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020)......................................................................................................13

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
  19 F.4th 145 (2d Cir. 2021) .......................................................................................................8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................................................................7

*Baum v. Harman Int'l Indus.*,
  575 F. Supp. 3d 289 (D. Conn. 2021).........................................................................................9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).....................................................................................................................7

*Bondali v. Yum! Brands, Inc.*,
  620 F. App'x 483 (6th Cir. 2015) .............................................................................................14

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
  556 F. Supp. 3d 100 (D. Conn. 2021).......................................................................................24

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
  866 F. Supp. 2d 223 (S.D.N.Y. 2012)..................................................................................24, 25

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014).......................................................................................................7

*City of Providence v. Aeropostale, Inc.*,
  WL 1197755 (S.D.N.Y. Mar. 25, 2013) ................................................................................9, 10

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991).......................................................................................................25

*Dodona I, LLC v. Goldman Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012).......................................................................................22

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005).................................................................................................................23

*Emps' Ret. Sys. of Gov't of the V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)..................................................................................17, 21

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d (S.D.N.Y. 2010) ................................................................................24

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018)...........................................................................9

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)..........................................................................20

*IEBW Loc. 90 Pension Fund v. Deutsche Bank AG*,
  2013 WL 1223844 (S.D.N.Y. March Mar. 27, 2013)....................................................24

*In re Advance Auto Parts, Inc., Sec. Litig.*,
  2020 WL 599543 (D. Del. Feb. 7, 2020) .....................................................................19

*In re Alphabet Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021).........................................................................................14

*In re Aphria, Inc. Sec. Litig.*,
  2020 WL 5819548 (S.D.N.Y. Sep. 30, 2020)..........................................................17, 21

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004)..........................................................................22

*In re Barrick Gold Sec. Litig.*,
  2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015).............................................................10, 11

*In re BHP Billiton Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017).............................................................................23

*In re Bristol-Myers Squibb Co. CVR Sec. Litig.*,
  658 F. Supp. 3d 220 (S.D.N.Y. 2023)...........................................................................20

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) ...............................................................19

*In re Dynex Cap., Inc. Sec. Litig.*,
  2009 WL 3380621 (S.D.N.Y. Oct. 19, 2006).................................................................20

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
  469 F. Supp. 2d 88 (S.D.N.Y. 2006)............................................................................11

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013)...........................................................................15

iii

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ...............................................................................19

*In re Fannie Mae 2008 Sec. Litig.*,
891 F. Supp. 2d 458 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013)........................22

*In re FBR Inc. Sec. Litig.*
544 F.Supp.2d 346 (S.D.N.Y. 2008).........................................................................................15

*In re Henry Schein, Inc. Sec. Litig.*,
2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) .........................................................................13

*In re JPMorgan Chase Sec. Litig.*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005).......................................................................................18

*In re KeySpan Corp. Sec. Litig.*,
2003 WL 21981806 (E.D.N.Y. July 30, 2003).........................................................................22

*In re Mylan N.V. Sec. Litig.*,
2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ..........................................................................21

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ..........................................................................15

*In re Nortel Networks Corp. Sec. Litig.*,
238 F. Supp. 2d 613 (S.D.N.Y. 2003)........................................................................................7

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)........................................................................................................8

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022)..........................................................................10, 11, 17

*In re Virtu Fin., Inc. Sec. Litig.*,
770 F. Supp. 3d 482 (E.D.N.Y. 2025) ......................................................................................11

*In re Wells Fargo & Co. Sec. Litig.*,
2021 WL 4482102 (S.D.N.Y. Sep. 30, 2021)...........................................................................10

*Inst. Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3rd Cir. 2009) ...................................................................................................10

*Karimi v. Deutsche Bank Aktiengesellschaft*,
607 F. Supp. 3d 381 (S.D.N.Y. 2022).......................................................................................18

*Long Miao v. Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020).......................................................................................20

iv

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)...................................................................................23

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)....................................................................................14

*Moshell v. Sasol Ltd.*,
  481 F. Supp. 3d 280 (S.D.N.Y. 2020).....................................................................18

*Nat'l Junior Baseball League v. PharmaNet Dev. Group, Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) .........................................................................12

*New Orleans Emps. Ret. Sys. v. Celestia, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ..............................................................................22

*Nguyen v. New Link Genetics Corp.*,
  297 F. Supp. 3d 472 (S.D.N.Y. Mar. 29, 2018) ......................................................19

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)............................................................................. *passim*

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ..............................................................8

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
  2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) .............................................17, 18, 19

*Puddu v. 6D Glob. Techs., Inc.*,
  2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ..............................................15, 16

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)...................................................................................20

*Schaffer v. Horizon Pharma PLC*,
  2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ...........................................................17

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021)..............................................................................11, 14

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)....................................................................................11

*Starr Int'l U.S.A. Invs., LC v. Ernst & Young, LLP (In re Lehman Bros. Sec. &
  ERISA Litig.)*,
  131 F. Supp. 3d 241 (S.D.N.Y. 2015).....................................................................24

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)...........................................................................1, 2, 16, 17

*Wang v. Cloopen Grp. Holding Ltd.*,
   661 F. Supp. 3d 208 (S.D.N.Y. 2023)..................................................................................11

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ......................................................................................10, 11

**Statutes**

15 U.S.C. 78u-4 .......................................................................................................................8

**Rules**

Fed. R. Civ. P. 8.....................................................................................................................23

Fed. R. Civ. P. 12...................................................................................................................7

**Other Authorities**

17 C.F.R. § 240.10b-5..............................................................................................................8

## I.    INTRODUCTION[1]

Defendants told investors that Plug Power Inc. ("Plug" or the "Company") was executing on an unprecedented, accelerated schedule to build and commission its first commercial-scale green hydrogen plant in Georgia and that the Georgia Plant would begin producing liquid hydrogen by the end of June 2023. Defendants reaffirmed the completion date in mid-June, days before the deadline, while representing that CEO Defendant Marsh had personally visited the plant and confirmed its imminent completion. Defendants repeatedly told investors that construction was in its "final steps," commissioning was underway, and that the plant would soon deliver "transformational" margin improvements to Plug's heretofore sustained negative margins.

None of this was true. The Georgia Plant was not in "final commissioning," construction was not nearly complete, critical equipment had not been delivered or installed, and the liquefaction system experienced malfunctions. Internally, senior Plug executives and industry experts had already warned Defendants that the aggressive timeline was unachievable. Defendants also knew that shortages of essential components, caused by Plug's failure to pay vendors, further impeded progress. Despite this, Defendants continued to publicly reaffirm the same deadlines and falsely portray any related risks as hypothetical.

Viewed holistically, as *Tellabs* requires, these allegations easily give rise to a cogent and compelling inference of scienter. Defendants repeatedly conveyed that they had real-time visibility into the Georgia Plant's status, by referencing firsthand observations during site visits. They positioned themselves as experts in the commissioning process. Moreover, they described the Georgia Plant as central to Plug's strategy for reducing negative fuel margins and achieving

---

[1] All "¶_" cites are to the Class Action Complaint for Violations of the Federal Securities Laws filed on August 25, 2025 ("AC") (ECF No. 61). "Mot." or "Motion" refers to the Memorandum of Law in Support of All Defendants' Motion to Dismiss the AC (ECF No. 65). Unless otherwise indicated, all emphasis is added and all internal citations and quotation marks are omitted.

profitability, making it implausible that they lacked awareness of the substantial delays and operational setbacks described in the AC. The far more compelling inference (at minimum equally compelling as any alternative inference, which is all *Tellabs* requires) is that Defendants knew, or were at least reckless in not knowing, that their statements were false when made.

The truth reached the market in stages, as Plug missed each of the deadlines it had promised. On August 9, 2023, Defendants first revealed that they had not achieved the June production date but claimed the plant would begin producing hydrogen later that same month. The Company's stock declined immediately. When Plug then disclosed in November 2023 that it had also missed the August deadline, while promising completion as soon as November 15, the stock price fell even more sharply. Analysts further downgraded the stock, pointing to Plug's repeated delays and inability to achieve the timeline Defendants had promised. These disclosures, and the market reaction to them, are classic examples of loss causation: the revelation or materialization of the very risks Defendants had concealed caused investors' losses.

Defendants attempt to recast these allegations as "fraud by hindsight," but the AC alleges contemporaneous facts showing that Defendants possessed, and ignored, information contradicting their public statements. Defendants did not merely misjudge a construction schedule; they repeatedly assured investors that the plant was on the verge of completion at times when internal information showed that it was not. They likewise portrayed supply chain risks as hypothetical despite already experiencing component shortages arising from nonpayment.

The AC alleges a straightforward securities fraud claim: Defendants told investors that the plant was nearing completion and that meaningful financial improvements were imminent, while knowing, or recklessly disregarding, that the project was months behind schedule and that the risks they purported to warn about had already materialized. When the truth emerged, investors suffered significant losses. The motion to dismiss should therefore be denied.

## II.    STATEMENT OF FACTS

### A.  Background

Plug is a hydrogen energy company that purports to manufacture, sell, and service hydrogen fuel systems and related infrastructure. ¶16. A significant portion of its revenue is generated through long-term agreements with customers who use Plug's hydrogen fuel cells in warehouses and distribution centers. ¶¶1, 24. Though these contracts obligate Plug to supply hydrogen fuel, historically Plug has lacked the ability to produce sufficient liquid hydrogen and has had to purchase liquid hydrogen from third-party suppliers at high cost and resell it at a loss, creating sustained negative margins on its fuel delivery business. *Id.* Plug therefore announced plans to build a network of green hydrogen production facilities, beginning with a liquid hydrogen plant in Woodbine, Georgia (the "Georgia Plant"). ¶¶2, 25, 27. Defendants described the Georgia Plant as central to Plug's strategy to vertically integrate hydrogen production, reduce reliance on third-party suppliers, improve negative fuel margins, serve as a model for additional plants in the U.S., and "reinforce Plug's dominance in green hydrogen." ¶¶2, 25, 27, 31. They assured investors that their "internal production of green hydrogen" would have a "transformational effect" on Plug's margins, because they'd no longer have to rely on third-party suppliers. ¶¶3, 26, 28, 31. Moreover, Defendants touted that the Georgia Plant would be the first ever to use Plug's electrolyzers, assembled at Plug's Vista facility, to produce hydrogen. ¶¶3, 26, 28.

Defendants repeatedly told investors that they would complete the Georgia Plant on a compressed timeline compared to industry norms and would begin producing liquid hydrogen by 2Q 2023, i.e., the end of June 2023. ¶¶3, 26, 29. Despite significant undisclosed setbacks, Defendants reiterated that promise on June 14, 2023, when Defendant Marsh told investors he'd be "walking Georgia" that day and that "Georgia will be putting out liquid at the end of the month." ¶¶29-30, 72. Plug told investors that they were in the final stages before commissioning and startup.

3

¶¶34, 36, 69, 72. These public statements created the impression that the project was largely complete and tracking toward the promised June 2023 production date (and after missing that deadline, toward the promised August 2023 completion date). *Id.*

Internally, however, Plug had not completed critical stages of construction and commissioning. ¶34. They lacked key components, experienced malfunctions, and work had been halted on multiple occasions. *E.g.*, ¶¶34, 41, 47, 49. Vendor nonpayment contributed to delays: Plug had not paid certain suppliers, causing them to halt deliveries and withhold equipment essential to startup. ¶¶45, 47, 49. Defendants Marsh and Middleton prioritized substantial quarterly bonuses, allocating funds to themselves rather than to supply procurement, investment in hydrogen facilities, vendor payments, or meeting customer requirements. ¶42. These facts were not disclosed to investors. Plug also encountered operational and engineering problems that further undermined its compressed construction timeline. Certain equipment malfunctioned during testing, and Plug lacked the necessary engineering expertise and staffing to address the issues promptly. ¶¶51, 52, 54-55, 60-61. The commissioning process—which required the integration and testing of cryogenic, electrical, and electrolyzer systems—had barely begun at the time Plug was publicly stating that the plant was nearing completion. ¶¶6, 34, 36, 52–55.

Defendants knew about the operational delays, component shortages, vendor issues, and commissioning failures that made the publicly stated timeline unattainable, received confirmation of that impossibility from experts and other Plug senior executives, yet nonetheless continued to assure investors that Georgia was on schedule and would imminently produce liquid hydrogen. ¶¶29-30, 34, 36, 40, 42, 54, 56–62, 106.

### B.  Defendants' False and Misleading Statements

**Timeline Misstatements**: Defendants repeatedly represented that the Georgia Plant was on track to begin producing liquid hydrogen by the end of the second quarter of 2023. ¶¶66, 69,

72. Plug stated that construction was proceeding according to its compressed schedule and that Georgia would produce liquid hydrogen by the end of June 2023. *Id*. Defendants reiterated their false assurances in press releases, during earnings calls, and on Analyst Days. *Id.* These statements conveyed that the project remained on schedule and that only final routine steps remained before commissioning and production. *Id*. In August, Defendants told investors that they had failed to meet their June 2023 deadline, but that Georgia would definitely begin producing liquid hydrogen in August 2023. ¶¶78, 81. Defendants represented that "final commissioning activities are underway" and that the plant would "be producing liquid here in the month of August." *Id*. Then, in October, after failing to previously disclosed that they'd blown through the August 2023 deadline as well, Defendants again falsely represented that "work is about to be completed." ¶88

Defendants' statements, promising that final steps were underway and assuring that Plug would achieve stated completion dates (even when revised post-hoc), were false and misleading because substantial work remained unfinished at the time they were made. Plug had not completed critical commissioning steps, experienced key equipment malfunctions, and lacked essential components due to Plug's failure to pay vendors.

**Margin Misstatements**: Defendants told investors that the Georgia Plant would materially improve, i.e., have a "transformational effect," on Plug's negative margins beginning in the second half of 2023 because, once the Georgia Plant became operational, Plug would no longer need to purchase hydrogen from third-party suppliers at a loss. ¶¶3, 25, 31. Plug tied margin improvements directly to the June and August 2023 production dates for the Georgia Plant, representing that margins would improve materially "from Q2 to Q4," and that they would "see notable improvement in fuel margin beginning in the second half of the year." ¶¶66, 78, 84-85. However, as explained *supra*, Defendants contemporaneously knew that the Georgia Plant would not be operational within the timeframe necessary to support the promised imminent margin

5

improvements. Nevertheless, their false statements omitted that Georgia was substantially behind schedule and would not produce any hydrogen by June, August, or even by year-end 2023.

**Risk Disclosure Misstatements**: Plug's filings warned investors of hypothetical risks, including the risks of potential delays, component shortages, and uncertainties in obtaining necessary materials, but omitted that these risks had already materialized. ¶¶64, 76, 91. Defendants represented that supply-chain disruptions *could* affect operations, without disclosing that Plug was *already* experiencing delays due to component shortages, halted work, and equipment malfunctions. *Id*. Defendants also omitted the self-imposed risk that Plug failed to pay vendors, resulting in withheld components essential to construction and commissioning. ¶¶65, 77, 92. Their risk disclosures thus misled investors because they presented actual problems as hypothetical. *Id*.

### C.  The Truth is Revealed

On August 9, 2023, Defendants revealed for the first time that Plug had not completed the Georgia Plant by the promised June 2023 deadline. ¶99. Defendants stated that they were "wrapping up the plant at this point in time" and would produce liquid hydrogen later that month. *Id*. Defendants also disclosed $45 million in startup and maintenance costs, resulting in adjusted EPS and EBITDA that significantly missed analyst expectations. *Id*. Plug's stock price declined approximately 15.8% the following day on unusually high trading volume. ¶100.

On November 9, 2023, Defendants revealed that they had also failed to meet the revised August 2023 production date but that liquid hydrogen production was now anticipated as early as November 15, 2023 but no later than year-end. ¶101. Plug further disclosed a going-concern qualification and reported additional significant misses on adjusted EPS and EBITDA. *Id*. Plug's stock price fell approximately 40.5% the next day, again on unusually high volume. ¶102.

Following these disclosures, analysts issued reports highlighting Plug's worsening cash burn, continued inability to produce hydrogen internally, and ongoing delays at the Georgia Plant.

6

¶103. Analysts stated that Georgia's failure to begin operations prevented Plug's margins from improving and impaired Plug's near-term revenue outlook. *Id.* Additional analyst reports in January 2024 attributed Plug's deteriorating prospects to further operational challenges and continued delays at the Georgia facility. ¶104. Plug's stock price declined further in response to this commentary. *Id.* On January 17, 2024, additional analyst reports reiterated concerns about delayed hydrogen-production capacity, revenue guidance, and Plug's overall profitability profile, noting that further delays at the Georgia Plant were likely. ¶105. By this point, Plug's stock price had declined to $2.74 per share. *Id.* On January 23, 2024, Plug announced that they had finally completed the Georgia Plant, approximately seven months after the originally promised date. ¶106. Analysts observed that Plug's credibility had been significantly impaired and that the Company needed to rebuild investor confidence in its business model and operational guidance. *Id.*

### III.    ARGUMENT

#### A.  Applicable Standards

Any Rule 12(b)(6) movant for dismissal faces a difficult hurdle. *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003). In ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572, 592 (2007) (Stevens, J., dissenting). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Nortel*, 238 F. Supp. 2d at 621. To survive a Rule 12(b)(6) motion, the AC need only contain enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To state a §10(b) claim, plaintiffs must plead: (1) a material misrepresentation or omission; (2) in connection with a purchase or sale of a security; (3) made with scienter; (4) reliance; (5) economic loss; and (6) loss causation. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,

7

750 F.3d 227, 232 (2d Cir. 2014). Under the Private Securities Litigation Reform Act ("PSLRA"), a plaintiff must specify each misstatement, the reasons the statement is misleading, and, if an allegation "is made on information and belief," "state with particularity all facts on which that belief is formed." 15 U.S.C. 78u-4(b)(1)(B). However, complaints do not need to plead "detailed evidentiary matter." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). This Circuit has cautioned that courts "must be careful not to mistake heightened pleading standards for impossible ones." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021).

### B. The AC Adequately Alleges Misleading Statements and Omissions

It is unlawful for a person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. Plaintiffs are only required to allege sufficient facts "to support a reasonable belief" that defendants' statements were materially false or misleading, *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000), which "depends on the perspective of a reasonable investor: The inquiry is objective," *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *5 (S.D.N.Y. Oct. 5, 2016). For each misstatement, the AC identifies the source, author, the date, and the reasons the statement misled investors. Falsity is thus adequately pled. The AC alleges that Defendants misled investors regarding: (i) the deadline for completing the Georgia Plant, which Defendants knew they could not achieve given lack of funds, supplies, and other operational obstacles; (ii) Plug's prospects for improving fuel margins in 2023, which did not exist given Plug's inability to achieve stated timelines; and (iii) the risks of supply and material shortages, which they characterized as hypothetical though they had already materialized. ¶¶62-97. Unable to dispute any of the foregoing, Defendants instead try to immunize their misrepresentations by invoking the safe harbor (though they issued misstatements of present fact that did not include meaningful cautionary language), and labeling other statements

8

as inactionable opinion (though they did not characterize their statements as opinions and, regardless, possessed information undermining that they held any such belief).

### 1) The PSLRA Safe Harbor Does Not Apply

The PSLRA's safe harbor only protects forward looking statements accompanied by meaningful cautionary language if defendants did not have actual knowledge of falsity, and thus does not apply. *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 297 (S.D.N.Y. 2018).

First, several of the alleged misstatements are purporting to describe present or historical facts, or inextricably linking predictions to present fact, and are thus not protected. *City of Providence v. Aeropostale, Inc.*, WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013); *See, e.g.,* ¶66 ("The plant ***has been*** brought online in less than a year;" "Based on learnings in Georgia, ***presently*** it takes six months to get plants from commissioning to full production;" "Georgia: Plug ***has made*** significant strides in ramping up liquid hydrogen production"); ¶69 ("our plants ***already*** producing gases hydrogen for our customers;" "our ability to construct green hydrogen plans ***is evident*** in Georgia"); ¶72 ("***I'm walking Georgia . . . . [R]eally kind of enjoyed looking at this 15-ton per day liquid hydrogen plant . . .*** Georgia will be putting out liquid at the end of the month . . . ."); ¶¶76, 91 (describing "[r]ecent [d]evelopments" pertaining to "[m]aterial [a]vailability"); ¶78 ("Final commissioning activities ***are underway . . . .***"); ¶81 ("***Right now***, we're essentially going through ramping up electrolyzer . . . ***[W]e've been*** producing gaseous hydrogen there . . . [W]e're wrapping up the plant ***at this point in time***"); ¶84 ("showcasing the accomplishments ***to date***"); ¶88 ("we're going through a process ***now***"); ¶93 ("***We are completing*** the final step of the commissioning process for the liquefiers/cold box"); ¶96 ("***We are continuing*** to see progress at our Georgia plant, and ***we are*** finishing the last step in the construction process, commissioning the liquefier"). These statements could have been disproven at the time of their issuance and thus do not "depend on the occurrence of future events." *See Baum v. Harman Int'l Indus.*, 575 F. Supp.

9

3d 289, 298 (D. Conn. 2021); *Aeropostale*, 2013 WL 1197755, at *12 (the safe harbor does not protect statements "whose accuracy can be determined at the time they were made" *or* mixed statements asserting that forward looking projections are supported by present facts). That differentiates this case from the examples Defendants cite. *See* Mot. at 9-10 (citing *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 211 (S.D.N.Y. 2022) (court applied safe harbor to statement that schedule was "on track" because the veracity of the statement depended on the future realization of the projected schedule and because, unlike here, the statement "on [its] own contain[ed] no details about Turquoise Hill's current situation"); *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 255-56 (3rd Cir. 2009) (similar); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021) (similar); *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *8 (S.D.N.Y. Apr. 1, 2015) (applying safe harbor to purely forward-looking statement with no present component)). As the Second Circuit has held, where statements "contain some elements that look forward and others that do not," the safe harbor does not apply to the part of the statement referring to the present. *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *11 (S.D.N.Y. Sep. 30, 2021). Defendants' cited cases agree. *Turquoise Hill*, 625 F. Supp. 3d at 211; *Avaya*, 564 F.3d at 255.

Second, to the extent the misstatements include forward looking promises regarding the deadlines for completing the Georgia Plant and for the consequent material improvement to margins, they are still actionable because Defendants did not include *meaningful* cautionary language. Rather, they generically warned that unidentified hypothetical delays *may* hypothetically "adversely affect our revenue and profitability." Mot. at 11. Plaintiffs do not contend that the safe harbor "demand[s] clairvoyance," *cf.* Mot. at 10, but that it demands that Defendants accurately divulge materialized risks rather than describe them generically or portray them as hypothetical. *Aeropostale*, 2013 WL 1197755, at *12 (cautionary language not "meaningful" or "sufficiently specific" if warning of "hypothetical" risk factors that are "in fact happening").

10

The remaining boilerplate risk disclosures Defendants identify fare no better. Each of the exhibits Defendants cite merely provide kitchen sink lists of statements the Company broadly describes as forward looking, generically states that they "involve significant risks and uncertainties," and in certain instances identifies hypothetical risks that "*may*" cause delays with the "hydrogen generation projects." Mot. at 11-12 (citing Exs. 3, 9, 11, 12, 14, and 16). None of the cited disclosures provided investors with substantive warnings tailored to the specific forward looking predictions nor did they reveal that the risks had already materialized. *See Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021); *Slayton v. Am. Express Co.*, 604 F.3d 758, 770 & n.5 (2d Cir. 2010); *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 513 (E.D.N.Y. 2025); *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 228 (S.D.N.Y. 2023); *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006) (cautionary language that does not "precisely address" risk is not meaningful).

Defendants cite cases they claim involved "similar cautionary statements," but none of them involved a materialized risk that defendants characterized as hypothetical or warned of generically. Mot. at 12 (citing *In re Meta Materials Inc. Sec. Litig.*, 2023 WL 6385563, at *13 (E.D.N.Y. Sep. 29, 2023) (defendants warned that "the scalability of the Company's production ability" "could lead to a materially adverse result" and it was "not [] ascertainable [at that time] whether the potential products would ultimately be effective and scalable"); *Turquoise Hill*, 625 F. Supp. 3d at 213 (defendants characterized the warning as "common," i.e., likely, rather than purely hypothetical); *Barrick Gold*, 2015 WL 1514597, at *8 ("cost and schedule estimates" were not only labeled forward looking, but were accompanied by substantive warnings regarding "operating or technical difficulties in connection with mining or development activities" that "was not boilerplate," and there were no facts alleged demonstrating defendants knew that the risk had already materialized); *Tesla*, 985 F.3d at 1193 & n.3 ("Plaintiffs did not directly challenge the

11

adequacy of Tesla's cautionary statements," which were "detailed and specific," and acknowledged that these were risks Tesla had already "experienced in the past"); *Nat'l Junior Baseball League v. PharmaNet Dev. Group, Inc*., 720 F. Supp. 2d 517, 536 (D.N.J. 2010) (applying safe harbor because "the language is not in the nature of a vague blanket disclaimer," as it is here, "but rather, is tailored specifically to risks associated with PharmaNet's financial projections" and identifies "the specific sources of that risk.")).Third, as explained *infra* §C.1, Defendants issued their statements with contemporaneous knowledge of their falsity. *Cf.* Mot. at 12. While *promising* investors that Plug would achieve stated timelines for completion and operation of the Georgia Plant, and material margin improvement thereafter, Defendants *knew* those timelines were unachievable because: (i) critical construction and commissioning steps at the Georgia Plant remained incomplete; (ii) Plug experienced delays due to lack of supplies; (iii) the mechanical equipment needed to successfully liquefy hydrogen gas was malfunctioning; (iv) third party suppliers had stopped providing materials to Plug because Plug was not paying them; (v) senior management at Plug, including VPs Mittelsteadt and Hamdan directly told Defendants Marsh and Middleton that the issued timelines were unattainable given the foregoing; and (vi) Defendant Marsh also witnessed the foregoing firsthand during on-site visits to the Georgia Plant around the time of his misstatements. *See, e.g.*, ¶¶34, 40-41, 45, 47, 49, 52, 54, 55, 108-13. Consequently, Defendants misled investors when claiming that the Georgia Plant progressed unimpeded toward achieving stated timelines and would thus successfully cut its margin losses in half before year-end.

### 2) Defendants' Misstatements Are Not Inactionable Opinion

Without citing to any particular statement, Defendants broadly argue that all misstatements regarding the "planned commissioning of the Georgia plant were quintessential opinion statements." Mot. at 13. However, Defendants did not use any belief-related moniker when they

published deadlines. To the contrary. They characterized the deadlines as objective guarantees (*see, e.g.,* ¶66 ("Plug's Georgia Liquid Green Hydrogen Plant *Will* Complete Commissioning and Continue to Ramp to Liquid Production throughout Q2"); ¶69 ("Additionally, *by the end of June*, our Georgia plant . . . ."); ¶72 ("So the important item is Georgia *will be* putting out liquid at the end of the month, and I can't wait."); ¶81 ("*[W]e are going to be* producing liquid here in the month of August;") and reaffirmed deadlines, purportedly verified by Defendant Marsh's on-site visits, days before their occurrence (*see, e.g.,* ¶69, 72). Unqualified statements are not opinions. *See In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *13 (E.D.N.Y. Sept. 27, 2019).

In any event, whether the statements are fact or opinion is of little significance—what matters is if the statements misled investors. *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175-77 (2d Cir. 2020) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015)). As Defendants concede, even opinions are actionable if the speaker did not hold the professed belief, included untrue facts, or omitted material facts that would "conflict with what a reasonable investor would take from the statement." Mot. at 13. While any of the foregoing render an opinion actionable, all three are present here: (i) Defendants could not have believed their stated timelines given their on-site visits, equipment malfunctions, supply shortages, and cash flow problems; (ii) their statements included untrue facts, portraying the construction in its final steps though it was months away from completion (¶78 ("final commissioning activities are underway…"); ¶88 ("work is about to be completed"); ¶93 ("We are completing the final step of the commissioning process . . . ."); ¶96 ("[W]e are finishing the last step in the construction process . . . ."); ¶101 ("We are completing the final step of the commissioning process . . . ."); and (iii) the omitted delays and obstacles conflicted with what reasonable investors would take from their statements promising deadlines.

13

Defendants misleadingly argue that they "repeatedly updated [deadlines] during the putative class period as events developed." Mot. at 13. Not so. They continually reaffirmed stated deadlines up to the last minute and only "updated" the deadlines post-hoc after they were missed. ¶¶81, 88, 93, 106. They further argue that the fact that former employees held differing opinions does not render their deadline statements misleading. Mot. at 13. However, the AC alleges that former employees stated *facts*, contemporaneously known to Defendants, which demonstrated that the published deadlines had no reasonable basis and were, indeed, unattainable.

### 3) Defendants' Risk Disclosures Regarding Supply and Material Shortages Are Actionable

Defendants further misled investors by warning that Plug merely faced a *hypothetical* risk of supply and material shortages, when Plug already experienced shortages due to Defendants' failure to pay suppliers. Had Defendants accurately disclosed this *materialized* risk, investors would have known that Plug's timeline for hydrogen production had been actively impeded by its cash flow difficulties. Citing a Sixth Circuit case that conflicts with Second Circuit precedent, Defendants remarkably argue that their misleading risk disclosures are not actionable because they had no duty to "educate investors on what harms are currently affecting the company." Mot. at 14 (citing *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015)); *cf. Set Cap.*, 996 F.3d at 85. *See also In re Alphabet Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021)(rejecting *Bondali* in light of Ninth Circuit precedent holding risk disclosures misleading for failing to reveal materialized risks). Indeed, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). By opting to speak about shortages that *could* impact operations, while simultaneously assuring investors that the Georgia Plant was "wrapping up" construction and "in final commissioning," Defendants

14

incurred a duty to reveal that lack of components had *already* impacted operations and contributed to their inability to achieve stated timelines for completion of the Georgia Plant.

Defendants remaining citations are equally inapt. Mot. at 14. *In re FBR Inc. Sec. Litig.* "decline[d] to find that boilerplate risk factors can never provide a basis for liability" and held that descriptions of regulatory risk could not have misled investors because "defendants never claimed that the company was in 'full compliance with all regulations, or that it had no outstanding regulatory issues.'" 544 F.Supp.2d 346, 362 (S.D.N.Y. 2008). Here, however, Defendants claimed that they could achieve their stated timelines though they could not. *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) is also distinguishable because there the disclosures did not include positive statements "that clashed with the Company's risk warnings on the same issues." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 518 (S.D.N.Y. 2013) (distinguishing *In re Noah* on that basis). Here, however, Defendants continually issued positive statements affirming their stated deadlines, which clashed with hypothetical warnings of supply shortages that could impact operations.[2] Missing the point, Defendant argue that they never told investors that they "had no payment issues with any of its suppliers." Mot. at 15. However, they told investors that they faced a *potential* risk that they'd "los[e] access to key 'component suppliers and manufacturing vendors'" (*id.*) when they'd *already* lost that access due to nonpayment, which directly impacted their repeatedly touted construction timeline.

Finally, citing two Forms 10-Q to proffer a fact-intensive truth on the market argument that is not ripe for adjudication, Defendants claim that they disclosed issues in Plug's supply chain. *Id. See Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *7 (S.D.N.Y. Mar. 30, 2021) ("the truth-

---

[2] Defendants cannot cite a single case from this Circuit supporting their contention that risk disclosures lack materiality. Mot. at 14-15. Investors undeniably would find it material that Plug would not experience the imminent transformational effect on margins promised because supply and material shortages, *inter alia*, meant Plug could not complete the Georgia Plant in the compressed timeline Defendants promised.

15

on-the-market defense is a heavy burden" and "rarely an appropriate basis for dismiss[al]"). The first 10-Q they cite, however, characterizes the risk of *component* shortages as hypothetical and assures investors that "[m]ost components essential to our business are generally available for multiple sources." ¶76. Regarding *raw materials*, the 10-Q states that "global energy prices and inflation have negatively impacted access to our key raw materials," but does not reveal that Plug's supply issues stemmed from nonpayment to vendors. *Id.* Moreover, to alleviate investor concern, the 10-Q goes on to describe mitigatory steps taken, none of which address the issue of their nonpayment. *Id.* The second 10-Q they cite states that Plug "has experienced inflationary increases in labor, parts and related overhead" but does not state that these increases caused any shortages. ¶91. The "discussions with suppliers" referenced earlier in the same paragraph had *nothing* to do with those inflationary increases, did not reveal Plug's failure to pay vendors, and stated that the supplier discussions "*may* impact" (rather than did impact) when they receive shipments. *Id.*[3]

### C.  The AC Adequately Alleges Scienter

In assessing whether the AC adequately pleads scienter, the Court must determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007). "The inference that the defendant[s] acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Instead, the inference must be only "cogent and at least as compelling as any opposing inference." *Id.* Scienter may be pled either by alleging facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*,

---

[3] Defendants incorrectly argue that there is no scheme liability where a claim is "limited to the contents of public disclosures." Mot. at 16. *See Puddu*, 2021 WL 1198566, at *11 (plaintiff "may [] establish, in a scheme liability claim, the existence of a 'manipulative or deceptive act' by pointing to alleged misrepresentations or omissions") (citing *Lorenzo v. SEC*, 587 U.S. 71, 77-78 (2019)).

216 F.3d at 307. Recklessness exists if Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Emps' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). Motive is not required. *See Tellabs*, 551 U.S. at 325.

### 1) Defendants' Actual Knowledge Demonstrates Scienter

The AC alleges that Defendants "knew facts or had access to information suggesting that their public statements were not accurate," thus presenting a classic fact pattern giving rise to a strong inference of scienter. *See Blanford*, 794 F.3d at 306; *Novak*, 216 F.3d at 308-09; *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at *6-7 (S.D.N.Y. Mar. 4, 2019). Specifically, Defendant Marsh admitted that he personally visited the Georgia Plant, conveying to investors that he had real-time reliable information regarding the status of construction and commissioning. ¶¶72, 108-11. Defendants argue that "[t]here are no allegations that those alleged visits revealed anything different than was said in the challenged statements." Mot. at 21. That is *precisely* what the AC alleges. Defendant Marsh explicitly stated on several occasions, close in time to the publicized deadlines for completion of the Georgia Plant, that he personally visited the Georgia Plant after which he reaffirmed the stated deadlines purportedly based on his observations. *See In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *9 (S.D.N.Y. Sep. 30, 2020) (finding scienter because "Defendants would have known such crucial information," such as whether assets were not operational, after conducting site visits).[4] Yet, despite repeated assertions that construction was in final stages, *with completion imminent*, Plug missed three publicized deadlines that they had reaffirmed *mere days before their occurrence.*

---

[4] Defendants' cases are distinguishable because visits to sites in those cases did not as easily lend themselves to observing contrary facts. *See e.g.*, *Turquoise Hill*, 625 F. Supp. 3d at 237 ("[A]llegations relat[ing] to an underground development project being built at a slower rate than scheduled and being overbudget . . . would not necessarily have been plainly visible to someone visi[ti]ng the Mine . . . .") *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *12 (S.D.N.Y. Jan. 18, 2018) (visits by Horizon executives to pharmacies insufficient to establish scienter because visits would not necessarily uncover abuses at pharmacies such as whether pharmacies were refilling prescriptions without patient authorization or misleading doctors about the drug pricing, etc.).

17

Moreover, not only is scienter beyond reasonable dispute given Defendant Marsh's firsthand observations, but the AC also alleges that industry experts (as Defendant Marsh admitted) as well as VPs Mittelsteadt and Hamdan directly told Defendants Marsh and Middleton that, based on concrete objective facts, Plug could not produce hydrogen in the unprecedented timeline they promised. ¶¶54, 61, 111-12. *See Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 389 (S.D.N.Y. 2022) (allegations that information was reported up to defendants supports scienter inference); *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 290 (S.D.N.Y. 2020) (a CWs allegation that key information "would have gone to the company's Vice President" supported scienter inference). Defendants ask this Court to disregard these damning allegations because the precise timing of Defendants conversations with the VPs is not alleged. Mot. at 20. However, it is well-established that the heightened standard for pleading securities fraud claims does not require Plaintiffs to "allege the exact date and time when defendants became aware of [contrary] information." *See In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005). In any event, the AC alleges that these conversations took place during the Class Period following Defendants issuance of the unrealistic timelines despite their possession of contradictory facts.

Indeed, it is "reasonable and plausible that Defendants [Marsh, Shretha, and Middleton] would be included in such discussions as the company's CEO[, CSO,] and CFO." *Tableau*, 2019 WL 2360942, at *7. That is particularly so because Defendants promised they could construct the Georgia Plant on an aggressively compressed timeline as compared to industry norms, though "experts" told them it couldn't be done, and stated that their ability to execute on this timeline meant investors would soon see a "transformational effect" on Plug's sustained negative margins. ¶¶3, 33, 72, 74, 111. Further, Defendant Marsh reassured investors that he and Defendant Shretha had "become experts in what it takes to build . . . and . . . really what it takes to commission." ¶88. *See also* ¶¶66, 69, 72, 78, 81, 84, 85, 93, 96.

18

Moreover, relatedly, given the substantial sustained negative margins and severe cash burn Plug experienced, Defendants knew that the financial and operational challenges within Plug, including supply shortages caused by their failure to pay vendors, rendered completion of the Georgia Plant by the promised deadlines even less plausible. ¶116. Multiple former employees corroborated that Plug frequently failed to make timely payments to vendors and contractors, which delayed the delivery of critical parts. *Id.* These facts, known internally, would have hindered progress on construction and commissioning, particularly given the unprecedented, accelerated timeline (i.e. the FE statements hardly "deal with irrelevant issues," Mot. at 18). ¶116 Defendants' attacks on the FE allegations are unavailing. Each FE is sufficiently described so as to validate the basis of their statements. *See* ¶¶39-61. *See Novak*, 216 F.3d at 314. Moreover, the FE statements corroborate one another, lending further credence to their statements. *In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 WL 249508, at *16 (S.D.N.Y. Jan. 20, 2015). Defendants argue that none of the former employees are alleged to have interacted directly with Defendants, ignoring the allegations regarding VPs Mittelsteadt and Hamdan (i.e., senior executives with "special knowledge," *cf.* Mot. at 19). Further, it is not required that former employees directly interact with defendants for the Court to credit their statements, particularly where they are only "one layer removed," as here. *See In re Advance Auto Parts, Inc., Sec. Litig.,* 2020 WL 599543 (D. Del. Feb. 7, 2020) (allegations that FE prepared internal forecasts of which defendants had access were credited where FE "was only a single layer removed from one of the individual defendants); *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 484 (S.D.N.Y. Mar. 29, 2018) (plaintiff not required to allege specific contact between CWs and individual defendants), *aff'd in part, vacated in part, remanded on other grounds sub nom. Abramson*, 965 F.3d at 165; *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *10 (S.D.N.Y. May 24, 2018) ("That some of the [CWs] lacked direct contact with the Individual Defendants does not undermine their

19

evidence.").[5] Moreover, the FEs did not need to have worked at the Georgia Plant to know about financial and operational difficulties generally plaguing Plug, particularly given that construction of the Georgia Plant also relied on production of components in other Plug facilities, including the Vista Plant where FE3 worked (¶¶28, 48). *Cf.* Mot. at 18[6]. In any event, scienter in this case does not depend on the FE allegations given allegations demonstrating Defendants' direct knowledge.

It is thus at least equally as plausible as any opposing inference that Defendants would have stayed apprised (based not only on site-visits but by any other means necessary) as to the status of construction given their lofty promises to accomplish a goal that historically had never been accomplished in the industry, a goal upon which their precarious financial condition depended. Thus, "[b]ecause the plaintiffs have specifically alleged the defendants had knowledge of facts or access to information contradicting the defendants' public statements…they have adequately alleged conscious misbehavior or recklessness." *Id*.

Defendants argue that they are not required to take a "gloomy" view of the future. Mot. at 20. However, the case Defendants rely upon qualifies that this is "subject to what current data indicates." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). The current data indicated that Plug could not achieve the aggressive timelines Defendants promised, i.e. Defendants "knew facts

---

[5] Defendants' cited cases, Mot. at 18-19, are distinguishable as witness allegations did not contain specificity regarding job duties and other details that would lend credence to witness statements. *See, e.g.*, *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 233 (S.D.N.Y. 2023) (the complaint failed to allege even one instance in which a defendant is alleged to have knowledge of alleged missteps in approval process); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011) (describing as "fatal" description of CW as merely "senior executive" without indication of job title and duties and CW providing a statement by a defendant with no indication of form and context defendant made statement or how CW was privy to the statement); *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 802-03 (S.D.N.Y. 2020) (descriptions of witnesses such as "four longtime [] employees – one of whom worked [] in a financial role" and "at least one sales agent that works with [the company]" and "former employees in [] finance divisions" with no allegations of time period witnesses worked at company were not sufficiently particular).

[6] Additionally, courts routinely credit FEs who left before the start of the class period, *cf.* Mot. at 18. *See In re Dynex Cap., Inc. Sec. Litig.*, 2009 WL 3380621, at *7 n.6 (S.D.N.Y. Oct. 19, 2006).

or had access to information suggesting that their public statements were not accurate," *i.e.*, bedrock allegations of scienter. *See Blanford*, 794 F.3d at 306; *Novak*, 216 F.3d at 308-09.[7]

Defendants' high-level positions, when considered with the rest of the AC's allegations, strengthen the inference of scienter. *See*, *e.g.*, *Aphria*, 2020 WL 5819548, *9 ("It is at least as compelling an inference that Neufeld and Merton likewise had access to such information given their positions at Aphria"); *Blanford*, 794 F.3d at 306; *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *12 (S.D.N.Y. Mar. 28, 2018) ("It requires no stretch of the imagination to infer that, due to their positions at the company . . . Defendants knew facts or had access to information suggesting that their public statements . . . were not accurate.").

### 2) The Magnitude of the Delay Supports the Inference of Scienter

The magnitude of the delay also supports scienter. ¶117. Defendants promised that the Georgia Plant would begin producing liquid hydrogen by second quarter of 2023, yet the plant did not commence production until January 2024, nearly seven months later. *Id.* This stark deviation from stated deadlines, which Defendants reaffirmed even days before they were missed, strongly supports that they knew their projected completion dates were unachievable. It is implausible, given a delay of this length, that Defendants did not know facts contradicting their public statements particularly given how vociferously they touted their ability to achieve an unprecedented timeline for construction of a plant they identified as central to their business strategy, and given their assurances that the plant would not only serve as a model for future plants but would *transform* Plug's negative margins. Given those promises, if they had no relevant knowledge of construction and commissioning status at the Georgia Plant, then they exhibited severe recklessness in issuing their misstatements.

---

[7] That the Georgia Plant was eventually completed faster than the industry average is irrelevant to the scienter inquiry; the issue is whether Defendants knew their own stated deadlines were impossible when issued. *Cf.* Mot. at 21.

21

Defendants' sole challenge to this argument is a flippant reference to "fraud-by-hindsight." *See* Mot. at 1, 21. Courts, however, reject such incantations of fraud-by-hindsight where, as here, a complaint alleges that "the company failed to take into account information that was available to it" when defendants made misstatements. *See, e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 494-95 (S.D.N.Y. 2004); *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 476 (S.D.N.Y. 2012) (similar), *aff'd*, 525 F. App'x 16 (2d Cir. 2013); *Dodona I, LLC v. Goldman Sachs & Co.*, 847 F. Supp. 2d 624, 644 (S.D.N.Y. 2012) (similar). The AC alleges that Defendants knew when making their false statements that they could not achieve their stated deadlines, that Plug would therefore not experience a transformational improvement of its margins in 2023, and that they had already experienced the material shortages they had characterized as hypothetical. ¶¶108-17; *see In re KeySpan Corp. Sec. Litig.*, 2003 WL 21981806, at *12 (E.D.N.Y. July 30, 2003) (not fraud by hindsight where defendants knew about "severe financial and operational difficulties" but told investors "all was well with the Company and getting better").

### 3) The Core Operations Doctrine Supports the Inference of Scienter

Defendants consistently told investors that the Georgia Plant was central to its strategy to vertically integrate hydrogen production, reduce reliance on third party suppliers, improve negative fuel margins, "reinforce Plug's dominance in green hydrogen," and would serve as the model for all future plants. ¶¶2-3, 27, 31, 114. Indeed, Defendants assured investors that their "internal production of green hydrogen" at the Georgia Plant would have a "transformational effect" on Plug's heretofore sustained negative margins because it would reduce reliance on third-party suppliers. ¶¶3, 26, 28, 31, 114. The core operations doctrine, considered as part of the Court's holistic analysis, therefore contributes to the inference of scienter. *See New Orleans Emps. Ret. Sys. v. Celestia, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) ("[A]llegations of a company's core operations . . . can provide supplemental support for allegations of scienter . . . .")

22

### 4) There is No Credible Alternative Inference

Defendants disingenuously argue that the inference of scienter is diminished by their "good faith" efforts to provide "regular updates about the Georgia plant and the reasons for delays." Mot. at 22-23. The timing of these "updates", however, dash any proclamations of "good faith." Defendants reaffirmed their June 2023 deadline on June 14, 2023 with Defendant Marsh claiming to have just "walk[ed]" the plant earlier that same week. ¶72. Defendants did not disclose that they missed the deadline until August 9, 2023. ¶81. In that same disclosure, they promised "we are going to be producing liquid here in the month of August" and claimed to be "wrapping up the plant at this point in time." *Id.* They did not disclose that they had also blown through the August deadline until October 11, 2023. ¶88. On November 9, 2023, Defendants again claimed to be "completing the final step of the commissioning process," with anticipated production "between November 15th and year-end." ¶¶93, 96. And yet again, Defendants did not disclose that they'd missed that deadline too until January 23, 2024, seven months after the initial promised deadline. ¶106. Defendants' belated and misleading updates thus *strengthen*, not undercut, the scienter inference.

### 5) The AC Adequately Alleges Corporate Scienter

Defendants concede that where scienter is alleged as to any Individual Defendants or other senior managers, then corporate scienter is also adequately alleged. Mot. at 23. As such, given that scienter is adequately alleged as to the Individual Defendants (and VPs Mittelsteadt and Hamdan), as described *supra*, corporate scienter is adequately alleged as to Plug. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177–78 (2d Cir. 2015); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 90 (S.D.N.Y. 2017).

### D. The AC Adequately Alleges Loss Causation for All Misstatements

Fed. R. Civ. Pro 8's "short and plain statement" standard applies to loss-causation allegations. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). "Pleading loss causation

23

… . . . is not meant to impose a great burden on plaintiffs." *IEBW Loc. 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 1223844, at *12 (S.D.N.Y. March Mar. 27, 2013). Plaintiffs can allege a materialization of a concealed risk or a corrective disclosure of a previously undisclosed truth that causes a stock-price decline. *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 245 (S.D.N.Y. 2012). A corrective disclosure need not be a "mirror image" tantamount to a confession of fraud. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d at 171, 202 (S.D.N.Y. 2010). Moreover, a perfect connection between the false statement and the precise risk that materialized is not required. *Starr Int'l U.S.A. Invs., LC v. Ernst & Young, LLP (In re Lehman Bros. Sec. & ERISA Litig.)*, 131 F. Supp. 3d 241, 265 (S.D.N.Y. 2015).

The AC sufficiently pleads loss causation *for all misstatements*. On August 9, 2023, Defendants revealed for the first time that they had missed their promised June 2023 deadline to complete the Georgia plant but would begin production that same month, causing Plug's stock price to drop 15.8%, and on November 9, 2023, Defendants revealed for the first time that they had also missed their August 2023 deadline and promised they'd begin production at the Georgia Plant by month's end, causing Plug's stock price to plummet 40.5%. Defendants did not actually complete the Georgia Plant until January 2024, seven months later than initially promised. Defendants concede that loss causation is adequately pled as to all misstatements, except "[s]tatements [r]egarding [m]aterial [a]vailability." Mot. at 23. However, their contention that there is no loss causation for these statements because neither Defendants nor cited analysts revealed their nonpayment to vendors misses the mark by several miles, Mot. at 24, because their failure to complete the Georgia Plant is a materialization of the risk caused in part by their nonpayment to vendors, *Bricklayers*, 866 F. Supp. 2d at 245. Moreover, Plaintiff's theory of loss causation is "supported by contemporaneous analyst commentary." *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 141 (D. Conn. 2021). Defendants' argue that the analyst commentary did not

24

reveal any "new information about the status of the Georgia Plant," Mot. at 24, but the analyst commentary and downgrades represented materializations of the concealed risk that Defendants could not complete and operate the Georgia Plant in the compressed timeframe they had promised. *Bricklayers*, 866 F. Supp. 2d at 245. The reports, which caused further stock drops, expressly tied Plug's deteriorating prospects to the delayed Georgia Plant.

### E.  The AC Adequately Alleges Control Person Liability

The AC pleads a predicate §10(b) violation, and thus pleads a §20(a) violation, *cf.* Mot. at 25. *See 380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 231 (S.D.N.Y. 2008).

### IV.    CONCLUSION

Defendants' Motion should be denied in its entirety. If the Court grants Defendants' Motion, or any part of it, Plaintiff respectfully requests leave to amend. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.").

Dated: December 8, 2025                    **POMERANTZ LLP**


                                            /s/ Tamar A. Weinrib
                                            Tamar A. Weinrib (Bar Roll No. 705932)
                                            600 Third Avenue, 20th Floor
                                            New York, New York 10016
                                            Telephone: (212) 661-1100
                                            Facsimile: (917) 463-1044
                                            taweinrib@pomlaw.com

                                            *Attorneys for Lead Plaintiffs David Bruder and*
                                            *Randy Slipher and Lead Counsel for the Class*


                                            **BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
                                            Peretz Bronstein (*pro hac vice application*
                                            *forthcoming*)
                                            60 East 42nd Street, Suite 4600
                                            New York, New York 10165
                                            Telephone: (212) 697-6484

Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for David Bruder*


**LEVI & KORSINSKY, LLP**
Adam M. Apton (*admitted pro hac vice*)
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Additional Named Plaintiffs Scott
Keenan and Jose Martinez*