**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**DAVID BRUDER,** ***Co-Lead Plaintiff, Individually and on Behalf of All Others Similarly Situated,***

**Plaintiffs,**

**vs.**

**1:24-CV-406 (MAD/DJS)**

**PLUG POWER INC., ANDREW MARSH, PAUL B. MIDDLETON, and SANJAY K. SHRESTHA,**

**Defendants.**

---

| **APPEARANCES:** | **OF COUNSEL:** |
| --- | --- |
| **POMERANTZ LLP**<br>600 Third Avenue, 20th Floor<br>New York, New York 10016<br>Attorneys for Co-Lead Plaintiffs<br>David Bruder and Randy Slipher | **JEREMY ALAN LIEBERMAN, ESQ.**<br>**TAMAR A. WEINRIB, ESQ.**<br>**JOSEPH ALEXANDER HOOD, II, ESQ.** |
| **LEVI & KORSINSKY, LLP**<br>33 Whitehall Street, 17th Floor<br>New York, New York 10004<br>Attorneys for Additional Plaintiffs<br>Scott Keenan and Jose Martinez | **ADAM M. APTON, ESQ.**<br>**GREGORY M. NESPOLE, ESQ.** |
| **DLA PIPER LLP**<br>1251 Avenue of the Americas<br>New York, New York 10020<br>Attorneys for Defendant Plug Power Inc. | **JOHN J. CLARKE., JR. ESQ.**<br>**STEVEN ROSATO, ESQ.** |
| **BOIES SCHILLER FLEXNER LLP**<br>30 South Pearl Street<br>Albany, New York 12207<br>Attorney for Defendants Andrew Marsh,<br>Paul B. Middleton, and Sanjay K. Shrestha | **GEORGE F. CARPINELLO, ESQ.** |

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On March 22, 2024, Plaintiff Ete Adote, individually and on behalf of all others similarly situated, commenced this action as a putative class action against Defendants Plug Power Inc. ("Plug"), Andrew Marsh, and Paul B. Middleton. *See* Dkt. No. 1. On November 22, 2024, the Court consolidated the action with a related action, naming David Bruder and Randy Slipher as Co-Lead Plaintiffs. *See* Dkt. Nos. 43, 44; *see also Lee v. Plug Power Inc.*, 1:24-CV-00598 (N.D.N.Y.). On August 25, 2025, the Co-Lead Plaintiffs, with Scott Keenan and Jose Martinez as additional named Plaintiffs ("Plaintiffs"), individually and on behalf of all others similarly situated, filed an amended complaint. *See* Dkt. No. 61. The amended complaint names Sanjay K. Shrestha[1] as a defendant, in addition to Plug, Marsh, and Middleton ("Defendants"). *See id.* Plaintiffs bring two causes of action against Defendants: (1) Violations of Section 10(b) and Rule 10b-5 of the Exchange Act (15 U.S.C. § 78j(b)) (against all Defendants); (2) Violations of Section 20(a) of the Exchange Act (15 U.S.C. § 78(t)) (against the individual Defendants). *See id.*

On October 28, 2025, Defendants filed a motion to dismiss. *See* Dkt. Nos. 64; 65. Plaintiffs filed a response. *See* Dkt. No. 67. Defendants filed a reply. *See* Dkt. No 68.

For the reasons that follow, Defendants' motion to dismiss is denied.

## II. BACKGROUND[2]

Plaintiffs are investors who purchased Plug common stock during the Class Period: between May 9, 2023, and January 16, 2024. *See* Dkt. No. 61 ¶¶ 7, 12-15. Defendant "Plug is a

---

[1] Plaintiff's amended complaint uses two different spellings for Defendant Sanjay's last name: Shretha and Shrestha. *See* Dkt. No. 61 ¶¶ 19, 80. Defendants utilize the latter spelling. *See* Dkt. Nos. 65, 66. The Clerk of the Court is respectfully ordered to amend the docket, accordingly.

[2] The facts set forth in the background section are derived from the Amended Complaint.

hydrogen energy company that manufactures, sells, and services hydrogen fuel systems and related infrastructure." *Id*. ¶ 16. Defendant Marsh "was, at all relevant times, Chief Executive Officer . . . and a director of Plug." *Id.* ¶ 17. Defendant Middleton "was, at all relevant times, Chief Financial Officer . . . of Plug." *Id.* ¶ 18. Defendant Shrestha "was, at all relevant times, Executive Vice President . . . and Chief Strategy Officer . . . of Plug." *Id.* ¶ 19.

In an attempt to produce its own liquid hydrogen, Plug planned to develop a plant capable of producing 15-tons of liquid hydrogen per-day, based in Woodbine, Georgia (the "Georgia Plant"). *See id.* ¶¶ 24-25. "Plug promoted the Georgia Plant as a model facility that would demonstrate its ability to build and operate hydrogen production on a large scale, reduce reliance on third-party suppliers, and materially improve hydrogen fuel margins." *Id.* ¶ 25. The Georgia Plant was to "be a template for additional facilities across the United States, . . . meaning the project's success was critical not only to near-term margins but also to the viability of Plug's broader build-out plan." *Id.* ¶ 31. In its public announcements, Defendants touted their belief that they would be able to build the Georgia Plant significantly more quickly than other companies had been able to build similar plants. *See id.* ¶¶ 31-33. Specifically, Defendants stated "Plug is set to launch the first green hydrogen production plant in the United States, breaking the industry standard timeline of 48 months . . . ." *Id.* ¶ 66.

"Plug repeatedly told investors that the Georgia Plant would begin producing . . . liquid hydrogen by the second quarter of 2023." *Id.* ¶ 29. For example, during an earnings call on May 9, 2024, Plug told investors, "our plants [are] already producing gases [sic] hydrogen for our customers, and we [expect] to achieve full production by the end of June . . . I'm going to be walking Georgia today, I'm excited." *Id.* (alterations in original). In a presentation to investors that same month, "the Company listed the Georgia Plant as 'Georgia 1st 15TPD – Q2 '23.'" *Id.*

¶30. On June 14, 2023, Defendant Marsh stated, "Georgia will be putting out liquid at the end of the month." *Id.*

The Georgia Plant was not producing liquid hydrogen at the end of June 2023. *See id.* ¶ 34. Plug did not immediately disclose this, instead announcing on August 9, 2023, "we are going to be producing liquid here [in Georgia] in the month of August." *Id.* ¶ 81. That same day, Plug issued a press release stating that "[f]inal commissioning activities are underway to reach 17.5 tons per day . . . of production on site during Q3 2023." *Id.* ¶ 78. Both goals were allegedly unmet. *See id.* ¶¶ 34-36. "Plug attributed the delays to reduced productivity due to heat levels and utilizing learnings from other sites." *Id.* ¶ 34. On October 11, 2023, Defendant Marsh stated that he wishes he could say "Georgia was putting out liquid today, [but] somewhere between 11/15 and 12/31, when the coal [sic] boxes – coal [sic] box is finally commissioned, where we're going through a process now of drying it out." *Id.* ¶ 88. This goal was repeated in a press release on November 9, 2023, and a conference call that same day. *See id.* ¶¶ 93, 96. On January 23, 2024, Plug finally announced that its Georgia Plant had started production of liquid green hydrogen that month." *Id.* ¶ 37.

Plug faced "serious internal and financial challenges that made timely completion of the Georgia Plant . . . less feasible." *Id.* ¶ 38. Plaintiffs have presented accounts of six former employees who recount such difficulties. *See id.* ¶¶ 39-61.

Former Employee 1 ("FE1") worked as a Senior Manager of Manufacturing from 2021 to 2024. *See id.* ¶ 39. "According to FE1, Plug was not paying its vendors." *Id.* ¶ 40. This information was relayed to the Executive Vice President of Global Manufacturing, who relayed it to Defendant Marsh. *See id.* The non-payment of vendors hindered Plug's ability "to obtain necessary parts for battery cell assembly." *Id.* ¶ 41. FE1 visited Plug's plant in Tennessee,

observing that the "plant was completely non-operational" due to a lack of funding. *Id.* ¶ 43. "According to FE1, the Georgia plant suffered from the same lack of funding." *Id.*

"Former Employee 2 ("FE2") was a contractor and consultant for Plug from 2022 to 2023." *Id.* ¶ 44. FE2 was owed around $500,000 by Plug when FE2 decided to stop working with Plug due to the lack of payment. *See id.* According to FE2, Plug's fiscal challenges in 2023 also made it unable to acquire parts. *See id.* ¶ 45. FE2 described operational challenges due to Plug's inability to make payments. *See id.* ¶¶46-47.

"Former Employee 3 ("FE3") was previously employed at Plug as a Senior Floor Supervisor at the Vista Plant[3] from 2021 to approximately March 2023." *Id.* ¶ 48. FE3 reports that Plug's non-payment of vendors led Plug to not purchase necessary assembly parts. *See id.* ¶ 49. Per FE3, the delays in the Georgia Plant were caused by "funding issues and insufficient infrastructure." *Id.* ¶ 50. "FE3 also observed recurring equipment quality issues." *Id.* ¶ 51.

"Former Employee 4 ("FE4") was previously employed at Plug as an Office Manager and Senior Administrative Assistant from June 2022 to August 2024." *Id.* ¶53. FE4 reports that Cortney Mittelsteadt, Vice President of Electrolyzer Technology, "told both [Defendants] Marsh and Middleton their timeline was unrealistic." *Id.* ¶ 54. Mittelsteadt disagreed with Plug's projections, told Marsh this, and "openly challenged him." *Id.*

"Former Employee 5 ("FE5") was previously employed at Plug as Director of Business Development-Stationary Storage from September 2021 to February 2024." *Id.* ¶ 56. FE5 described non-payment of vendors as an issue that led Plug to not fulfill its contract with Energy Vault, a third-party client. *See id.* ¶¶ 57-58.

[3] The Vista Plant is located in Slingerlands, New York. *See* Dkt. No. 61 ¶ 28.

"Former Employee 6 ("FE6") was employed by Plug from June 2023 to March 2025," working as a Commercial Finance Manager and then Senior Product Manager. *Id.* ¶ 59. "FE6 explained that delays at the Georgia and Tennessee plants were due to quality and engineering issues." *Id.* ¶ 60.

According to Plaintiffs, Plug did not disclose that it was "not paying its suppliers." *Id.* ¶¶ 65, 67, 77, 79, 86, 92. Instead, it spoke of "cost pressures from global energy prices and inflation [that] have negatively impacted access to [the company's] raw materials." *Id.* ¶¶ 64, 76. It also warned that a loss of particular vendors "could have a material adverse effect." *Id.* ¶¶ 64, 76, 91.

Plaintiffs allege that difficulties at the Georgia Plant led to Plug's stock price falling. *See id.* ¶¶ 98-106. Specifically, between August 9, 2023, when Plug disclosed the Plant was not yet finished, "and August 10, 2023, Plug's stock price dropped approximately 15.8%." *Id.* ¶ 100. "Between November 9, 2023, and November 10, 2023, Plug's stock price dropped approximately 40.5%." *Id.* at ¶ 102. In November of 2023 and January of 2024, analysts noted that the Georgia Plant was not finished and argued that its completion was important to the business. *See id.* ¶¶ 103-05.

## III. DISCUSSION

### A. Legal Standards

#### *1. Motion to Dismiss*

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency of a complaint, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shar Fund, Ltd.*,

493 F.3d 87, 98 (2d Cir. 2007). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," FED. R. CIV. P. 8(a)(2), with sufficient factual "heft to sho[w] that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," and present claims that are "plausible on [their] face." *Id.* at 555, 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement of relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Twombly*, 550 U.S. at 558, 570.

Actions "brought under Section 10(b) and Rule 10b-5 are subject to heightened pleading requirements." *In re ASML Holding N.V. Sec. Litig.*, 825 F. Supp. 3d 208, 226 (S.D.N.Y. 2026). First, the Federal Rules of Civil Procedure require that when "alleging fraud or mistake, [the plaintiff] must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). For a securities fraud action alleging fraudulent statements or omissions, the complaint "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns*, 493 F.3d at 99. Second, "[p]rivate securities fraud actions also must meet the heightened pleading requirements of the Private Securities Litigation

Reform Act." *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014). In the securities fraud context, "when a cause of action requires proof of scienter, the complaint must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)).

**B. Private Securities Litigation Reform Act**

A plaintiff bringing a claim under Section 10(b) of the Securities Exchange Act must show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (quoting *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). "Section 20(a) liability is derivative of Section 10(b) liability." *Genesee Cnty. Employees' Ret. Sys. v. DocGo Inc.*, 773 F. Supp. 3d 62, 92-93 (S.D.N.Y. 2025). "'[T]o state a claim of control person liability under [Section] 20(a), a plaintiff must show [i] a primary violation by the controlled person, [ii] control of the primary violator by the defendant, and [iii] that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Id.* (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014)) (additional quotation marks and citation omitted).[4]

As to the substance of the Section 10(b) claim, Defendants argue that Plaintiffs have not alleged three of the six requisite elements, arguing (1) that Plaintiffs did not allege an actionable

[4] Defendants do not provide independent grounds to move to dismiss the Section 20(a) claim and argue only that "[b]ecause [P]laintiffs do not plead a primary violation of the securities laws, their controlling person claim under section 20(a) of the Exchange Act also should be dismissed." Dkt. No. 65 at 25. Plaintiffs similarly argue only that "[t]he [amended complaint] pleads a predicate §10(b) violation, and thus pleads a §20(a) violation[.]" Dkt. No. 67 at 25.

misstatement or omission; (2) that Plaintiffs did not adequately plead scienter; and (3) that with respect to statements about material availability, Plaintiffs did not adequately plead loss causation. *See* Dkt. No. 65. Plaintiffs disagree on all three points. *See* Dkt. No. 67.

***1. Misrepresentations or Omissions***

Defendants argue that Plaintiffs have not pled a material misrepresentation or omission for numerous reasons. First, they argue that the Private Securities Litigation Reform Act ("PSLRA") safe harbor applies to statements about the Georgia Plant. *See* Dkt. No. 65 at 8-12.[5] Second, Defendants contend Plaintiffs fail to allege that the risk disclosure statements unrelated to the Georgia Plant were false. *See id.* at 13-16. Third, that Plaintiffs have not alleged "scheme" liability. *Id.* at 16. Fourth, Defendants argue their statements were inactionable opinions. *See id.* at 13.

"The PSLRA established a statutory safe-harbor for forward-looking statements." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 765 (2d Cir. 2010). "With certain exceptions . . ., where a 'private action . . . is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading,' a defendant 'shall not be liable with respect to [certain] forward-looking statement[s][.]" *Id.* "Forward-looking statements include those containing 'projection[s] of revenues . . . or other financial items,' 'plans and objectives of management for future operations,' and discussions of 'future economic performance.'" *Mangrove Partners Master Fund, Ltd. v. Bristol-Myers Squibb Co.*, No. 24-826, 2025 WL 1420914, *3 (2d Cir. May 16, 2025) (summary order) (quoting 15 U.S.C. §§ 77z-2(i)(1); 78u-5(i)(1)). A statement is forward-looking if it "refer[s] to the present only as a means for gauging future possibilities and, 'when read in context, cannot meaningfully be distinguished from the future projection of

[5] Citations are to the pagination provided by the parties at the bottom of each page.

which [it is] a part.'" *Gissin v. Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) (quoting *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009)). Under the safe-harbor provision "a defendant is not liable if (1) 'the forward-looking statement is identified and accompanied by meaningful cautionary language,' (2) the forward-looking statement 'is immaterial,' or (3) 'the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (quoting *Slayton*, 604 F.3d at 766). "Because '[t]he safe harbor is written in the disjunctive,' a forward-looking statement is protected under the safe harbor if any of the three prongs applies." *Id.* at 245-46 (citation omitted).

The parties disagree as to whether Defendants' statements are "forward-looking." *Compare* Dkt. No. 65 at 9-10, *with* Dkt. No. 67 at 9-12. In their amended complaint, "Plaintiffs use italicized and bold typeface . . . to denote false and/or misleading statements. Accompanying text appearing in original typeface (*i.e.*, not emphasized) is provided for context and is not alleged to be per se false or misleading." Dkt. No. 61 ¶ 62 n.1.

In their response to the motion to dismiss, Plaintiffs argue that "several of the alleged misstatements are purporting to describe present or historical facts, or inextricably linking predictions to present fact, and are thus not protected." Dkt. No. 67 at 9. Plaintiffs point to several examples of statements that appear to have been made in the present tense, and which do not appear to be forward-looking. *See id.* at 9-10 (quoting Dkt. No. 61 ¶ 66 ("The plant ***has been*** brought online in less than a year"), ¶ 69 ("[O]ur plants ***already*** producing gases [sic] hydrogen for our customers"); ¶¶ 76, 91 (describing "[r]ecent [d]evelopments" regarding "[m]aterial availability"). However, the portions of those statements that Plaintiffs emphasize through bold and italicized typeface in their opposition, are *not* emphasized in their amended complaint. *See*

Dkt. No. 68 at 2 (arguing that Plaintiffs' "opposition relies on excerpts that were not emphasized to support plaintiffs' safe harbor argument"). Because these examples were not alleged to be false or misleading in the amended complaint, they are not actionable. *See* Dkt. No. 61 ¶ 62 n.1.

Other examples provided by Plaintiffs are phrased in the current tense and emphasized in the amended complaint, but contrary to Plaintiff arguments, appear to be statements concerning future projections. *See e.g.,* Dkt. No. 67 at 9-10 (quoting Dkt. No. 61 ¶ 66 ("Based on learnings in Georgia, ***presently*** it takes six months to get plants from commissioning to full production"); ¶ 78 ("Final commissioning activities ***are underway***"); ¶ 81 ("[W]e're wrapping up the plant ***at this point in time***"); ¶ 93 ("***We are completing*** the final step of the commissioning process for the liquefiers/cold box"); ¶ 96 ("***We are*** . . . finishing the last step in the construction process")). Although the phrases include the word "are," they are concerned about what is coming later in time regarding production. Because these alleged statements are forward-looking, they are potentially protected by the safe-harbor provision. *See Gissin,* 739 F. Supp. 2d at 505.

Plaintiffs next identify several statements which they do not sufficiently allege to be false. *See* Dkt. No. 67 at 9-10 (quoting Dkt. No. 61 ¶ 66 ("Georgia: Plug ***has made*** significant strides in ramping up liquid hydrogen production"); ¶ 69 ("[O]ur ability to construct green hydrogen plan[t]s ***is evident*** in Georgia"); ¶ 81 ("***Right now***, we're essentially going through ramping up electrolyzer . . . ***[W]e've been*** producing gaseous hydrogen there"); ¶ 84 ("showcasing the accomplishments ***to date***"); ¶ 88 ("[W]e're going through a process ***now***"); ¶ 96 ("***We are*** continuing to see progress at our Georgia Plant and ***we are*** . . . commissioning the liquefier")). Plaintiffs do not contest the veracity of the facts underpinning these statements. As Defendants explain, "Plaintiffs do not dispute that [Defendant] Marsh toured the Georgia plant." Dkt. No. 68 at 3. Likewise, Plaintiffs do not appear to contest that "Plug has made significant strides in

ramping up liquid hydrogen production." Dkt. No. 61 ¶ 66. Rather, they dispute the publicized timeline for the completion of production. Therefore, Plaintiffs have not "explain[ed] why the[se specific] statements were fraudulent," *ATSI Commc'ns, Inc.*, 493 F.3d at 99, which permits their protection under the safe harbor, *see Diabat v. Credit Suisse Grp. AG*, No. 23-CV-5874, 2024 WL 4252502, *97 (S.D.N.Y. Sept. 19, 2024) (dismissing claims where the "[p]laintiff has 'failed to plead with particularity the fourth prong of the Rule 9(b) requirements, namely, 'how the statements were false or misleading'") (quoting *Caiafa v. Sea Containers Ltd.*, 525 F.Supp.2d 398, 409 (S.D.N.Y. 2007)).

With respect to the forward-looking statements, Defendants argue that the safe-harbor provision applies, because they "were accompanied by meaningful cautionary language identifying 'important factors that could cause actual results to differ materially.'" Dkt. No. 65 at 10 (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)). Meaningful cautionary language must "'not [be] boilerplate and [must] convey[] substantive information.'" *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 376 (S.D.N.Y. 2018) (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010)). Meaningful cautionary language must be "'tailored to the specific future projections, estimates or opinions in the [statements that] the plaintiffs challenge.'" *Id.* (quoting *Slayton*, 604 F.3d at 772). "To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.'" *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)). To be meaningful, cautionary language must "disclose that the risk factors were not merely hypothetical . . . but were in fact

happening." *City of Providence v. Aeropostale, Inc.*, No. 11-CV-7132, 2013 WL 1197755, *12 (S.D.N.Y. Mar. 25, 2013).

Defendants' future-looking statements included some cautionary language. In their motion, they cite exhibits they attached which include full statements from Plug. *See* Dkt. No. 65 at 11-12. For example, in a document related to "Conference Call Information" dated August 9, 2023, Plug included a "Cautionary Note on Forward-Looking Statements" whereby it stated, "This communication contains 'forward-looking statements' within the meaning of the [PLRSA] that involve significant risk and uncertainties about Plug . . . ." Dkt. No. 66-9 at 22. Plug then listed dozens of risks, including for example, "statements about Plug's forecasted revenue," "the expectation that Plug's fuel business will turn positive once its Georgia, Tennessee, Louisiana and Texas plants are operating at full capacity," "the ability of Plug to obtain financing or financing on acceptable terms," and "the achievement of expected outputs at Plug's newly commissioned Georgia plant and the expectation that it will cut Plug's fuel margin loss." *Id.* at 22-23. Plug "cautioned that such statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times that, or by which, such performance or results will have been achieved." *Id.* at 24. Plug also stated:

> For a further description of the risks and uncertainties that could cause actual results to differ from those expressed in these forward-looking statements as well as risks relating to the business of Plug in general, see Plug's public filings with the Securities and Exchange Commission, including the "Risk Factors" section of Plug's Annual Report on Form 10-K for the year ended December 31, 2022, Plug's Quarterly Report on Form 10-Q for the quarter ended March 31, 2023[,] as well as any subsequent filings.

*Id.* The exact same information was included in a separate statement dated May 9, 2023. *See* Dkt. No. 66-3 at 19.

In one of its statements dated August 23, 2023, Plug stated, "You can identify the forward-looking statements by forward-looking words such as "anticipate," "believe," "could," "continue," "estimate," "expect," "forecast," "intend," "may," "should," "will," "would," "plan," "projected," "target," or the negative of such words or other similar words or phrases." Dkt. No. 66-11. The same was included in a statement dated October 11, 2023. *See* Dkt. No. 66-14 at 6.

"Defendants argue that courts have applied the safe harbor based substantially similar cautionary statements." Dkt. No. 65 at 20. Defendants are correct insofar as the cases that they cite support the use of forward-looking statement disclaimers where those disclaimers include substantive and tailored cautionary language to the future projections at issue. *See id.* (citing *In re Meta Materials Inc. Sec. Litig.*, No. 21-CV-7203, 2023 WL 6385563, *13 (E.D.N.Y. Sept. 29, 2023), *vacated by agreement of the parties*, 2024 WL 6904562 (E.D.N.Y. May 22, 2024); *In re Barrick Gold Sec. Litig.*, No. 13-CV-3851, 2015 WL 1514597, *8 (S.D.N.Y. Apr. 1, 2015); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 536 (D.N.J. 2010)).

Plaintiffs do not dispute this general rule but argue that Defendants' statements are actionable because their disclaimers were generic and made contemporaneously with knowledge of their falsity. *See* Dkt. No. 67 at 11-12. Specifically, Plaintiffs contend:

> Defendants knew those timelines were unachievable because: (i) critical construction and commissioning steps at the Georgia Plant remained incomplete; (ii) Plug experienced delays due to lack of supplies; (iii) the mechanical equipment needed to successfully liquefy hydrogen gas was malfunctioning; (iv) third party suppliers had stopped providing materials to Plug because Plug was not paying them; (v) senior management at Plug, including VPs Mittelsteadt and Hamdan directly told Defendants Marsh and Middleton that the issued timelines were unattainable given the foregoing; and (vi) Defendant Marsh also witnessed the foregoing firsthand during on-site visits to the Georgia Plant around the time of his misstatements.

*Id.* at 12 (citing Dkt. No. 61 ¶¶ 34, 40-41, 45, 47, 49, 52, 54, 55, 108-13).

Plaintiffs have sufficiently alleged that Plug was not paying vendors and it was not obtaining necessary assembly parts. *See generally* Dkt. No. 61. Although Plug warned, generally, that it may be subject to risks such as "Plug's expectation regarding its capital structure and ability to obtain project finance debt; and Plug's expectation regarding its liquidity and potential for investments and flexibility to leverage its investments to capture market opportunities," Dkt. No. 66-14 at 6, Plaintiffs allege that Plug never told investors it was actively failing to pay its vendors and receive necessary supplies, both of which slowed the production of the Georgia Plant. *See generally* Dkt. No. 61. At this stage, Plaintiffs have sufficiently alleged that some of the risks discussed in Defendants' statements had materialized and were not supported by meaningful cautionary language.

Next, Defendants argue the safe harbor applies to the forward-looking statements because Defendants lacked "actual knowledge" of any of the statements' falsity. To escape application of the safe harbor, Plaintiffs must "prove that [Defendants' statements were] made with actual knowledge that [they were] false or misleading." *Slayton*, 604 F.3d at 766.[6] Under Second Circuit precedent, Plaintiffs "must show actual subjective knowledge." *Id.* at 776 n.9. Recklessness does not suffice. *See id.* Even if the risks are "'so obvious that . . . defendant[s] must have been aware of them,' this would not avail the plaintiffs." *Id.* (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)). Plaintiffs "must allege 'what specific

[6] Defendants argue in their reply that Plaintiffs did not dispute their "actual knowledge" argument. Dkt. No. 68 at 5. Plaintiffs' response brief does not address "actual knowledge" in their discussion of the safe harbor provision. *See* Dkt. No. 67 at 9, 12. However, Plaintiffs argue that "Defendants issued their statements with contemporaneous knowledge of their falsity," and address "actual knowledge" while addressing their scienter arguments. *See id.* at 17-21. The Court finds that Plaintiffs did not concede the "actual knowledge" issue.

contradictory information the makers of the statements had and the connection (temporal or otherwise) between that information and the statements at issue.'" *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 238 (S.D.N.Y. 2022) (quoting *In re Adient plc Sec. Litig.*, 2020 WL 1644018, *28 (S.D.N.Y. Apr. 2, 2020)).

Plaintiffs draw upon several facts to argue that the actual knowledge can be inferred. Plaintiffs first argue that Defendant Marsh's visit to the Georgia Plant would have led him to know that the timeline the company presented in its public statements was false, as he would have had access to information such as what assets were operational. *See* Dkt. No. 67 at 17-18. Plaintiffs cite to *In re Aphria, Inc. Sec. Litig.*, No. 18-CV-11376, 2020 WL 5819548, *9 (S.D.N.Y. Sept. 30, 2020). *See id.* at 17. There, the defendants stated that they would be acquiring an "established and successful" company which would increase their value. *In re Aphria, Inc. Sec. Litig*, 2020 WL 5819548, at *8. The plaintiffs argued that the defendants knew their statements were false because they visited the site of the company to be acquired which showed a non-operational building. *See id.* The court agreed that "[w]hile statements of puffery or optimism are often not actionable, a reasonable investor would understand that an asset being touted as 'world class' or repeatedly referenced as 'established and successful,' for example, is an asset that is, at a minimum, operational." *Id.* at *9 (quoting *Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014)).

Defendants do not address this case in their reply. *See* Dkt. No. 68. The Court finds it very persuasive. Here, Plaintiffs allege that Defendant Marsh told investors he was "in Georgia" the week of June 14, 2023, and after "walking Georgia" he stated that "Georgia will be putting out liquid at the end of the month[.]" Dkt. No. 61 ¶ 72. However, "the Georgia Plant did not begin producing liquid hydrogen until January 2024[.]" *Id.* ¶ 5. The Court agrees that although

statements about timeline projections are often not actionable, a reasonable investor would understand that when the head of a company states he has walked around the Plant and it would be "putting out liquid at the end of the month," that the Plant would therefore be operational. To be sure, the site visit alone would likely be insufficient to establish actual knowledge, but Plaintiffs rely on additional evidence to support their claims.

Plaintiffs also reiterate their allegations "that industry experts (as Defendant Marsh admitted) as well as [] Mittelsteadt and Hamdan directly told Defendants Marsh and Middleton that, based on concrete objective facts, Plug could not produce hydrogen in the unprecedented timeline they promised." Dkt. No. 67 at 18 (citing Dkt. No. 61 ¶¶ 54, 61, 111-12). Specifically, Defendant Marsh reported that "experts" told him that "it couldn't be done," Dkt. No. 61 ¶ 111, Mittelsteadt "told both [Defendants] Marsh and Middleton their timeline was unrealistic," and Hamdan "voiced similar objections," *id.* ¶¶ 54, 112.

Defendants argue that "[t]he amended complaint does not say when such an alleged conversation occurred, why the unidentified speaker purportedly disagreed with the schedule, or that either Mr. Marsh or Mr. Middleton 'ever accepted' his or her view 'that the goal was impossible.'" Dkt. No. 65 at 20. Defendants analogize to *Turquoise Hill*. *See id.* In that case, the plaintiffs asserted that executive defendants had "actual knowledge" about their statements' falsity because (1) the defendants said "that they were 'plugged in' and had 'visibility" and (2) the problems were significant. *Turquoise Hill*, 625 F. Supp. 3d at 238. The district court dismissed the claims, explaining:

> Allegations of Defendants' specific contrary facts are particularly necessary, here, where the allegations relate to an underground development project being built at a slower rate than scheduled and being overbudget—facts that would not necessarily have been plainly visible to someone vis[it]ing the Mine—and where Plaintiffs

> fail to allege that Defendants had a motive and opportunity to commit securities fraud.

*Id.* The court also stated that the "[d]efendants' 'high-level positions' [] do not cure [the p]laintiffs' failure to allege the contrary facts to which [the d]efendants had access." *Id.* at 239.

Here, Plaintiffs allege that Defendants were directly told by multiple people that their timelines were not likely to be met. Similar allegations were not present in *Turquoise Hill* and thus support this Court coming to a contrary conclusion. Plaintiffs' specific identification of "statements containing [the contrary facts]" support an inference of actual knowledge. *Finger v. Pearson PLC*, No. 17-CV-1422, 2019 WL 10632904, *13 (S.D.N.Y. Sept. 16, 2019). To provide further support for their position, Plaintiffs rely on (1) the individual Defendants' high-level positions within Plug; and (2) Plug's alleged failure to "make timely payments to vendors and contractors" which would have been "known internally [and] would have hindered progress on construction and commissioning." Dkt. No. 67 at 19.

Plaintiffs claim that Defendants' "high-level positions" create an inference that they "would have stayed apprised . . . as to the status of construction given their lofty promises to accomplish a goal that historically had never been accomplished in the industry[.]" Dkt. No. 67 at 20-21. They also rely on the "magnitude of the delay" to support the inference. *Id.* at 21.

Defendants argue Plaintiffs claims amount to "fraud by hindsight," Dkt. No. 65 at 21, which would inappropriately conclude that Plug had "actual knowledge" of its statements' falsity because it ended up failing to complete the Georgia Plant by the date it had presented. *See Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, 723 Fed. Appx. 20, 22 (2d Cir. 2018) (summary order). "The term 'fraud by hindsight' generally refers to the pleading device wherein a plaintiff (1) alleges that bad news that was ultimately disclosed by the company should

have been announced sooner," "or (2) alleges that the defendant made optimistic statements in the past and contends that those statements were fraudulent because subsequent developments proved them to be false." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 494 (S.D.N.Y. 2004).

In *Waterford*, the Second Circuit "agree[d] with the district court that the[ plaintiffs'] allegations amount[ed] to 'fraud by hindsight' because '[the p]laintiffs ple[]d no facts demonstrating that the Company did not actually believe that it could achieve increased labor productivity with the increased loan volume at the time it made the positive statements[.]" *Waterford Twp. Police*, 723 Fed. Appx. at 22 (citation omitted). The Second Circuit stated, "nor do [the plaintiffs] identify any contemporaneous facts that would have rendered such a belief unfounded.'" *Id.*

As Plaintiffs state in their opposition, the amended complaint "alleges that Defendants knew when making their false statements that they could not achieve their stated deadlines, that Plug would therefore not experience a transformational improvement of its margins in 2023, and that they had already experienced the material shortages they had characterized as hypothetical." Dkt. No. 29 at 22. At this stage of the case, the Court must accept Plaintiffs allegations as true. Plaintiffs do not allege only that Defendants proposed a timeline for the Georgia Plant to be complete and then it just so happened to not be finished on time. Rather, they allege that former employees told Defendants or other management that the timeline would not be met, Defendant Marsh visited the Plant and therefore saw that the stated timeline was unrealistic, and Defendants were aware of monetary issues regarding vendors which would impact the funding to the Georgia Plant. At this stage of the case, the Court finds that these are "contemporaneous facts that would

have rendered such a belief [about the timeline] unfounded." *Waterford Twp. Police*, 723 Fed. Appx. at 22.

Defendants also argue that their statements are inactionable opinions. *See* Dkt. No. 65 at 13. Plaintiffs argue that Defendants "characterized the deadlines as objective guarantees," and "Defendants could not have believed their stated timelines," "their statements included untrue facts," and "the omitted delays and obstacles conflicted with what reasonable investors would take from their statements promising deadlines." Dkt. No. 67 at 13.

"An opinion statement can give rise to liability under federal securities laws if a plaintiff pleads that 'the speaker omit[ted] information whose omission makes the statement misleading to a reasonable investor.'" *Sec. & Exch. Comm'n v. Feller*, No. 24-CV-2896, 2024 WL 4753603, *2 (S.D.N.Y. Nov. 12, 2024) (quoting *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016)). "If a statement turns on the exercise of subjective judgment, a plaintiff will be unable to establish that it is false merely by showing that other reasonable alternative views exist." *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 41 (2d Cir. 2024). "Where those alternatives exist, the speaker making the statement (expressing an opinion) can choose among them without running afoul of the federal securities provisions at issue here." *Id.* (citation omitted). "But opinions lead double lives." *Id.*

"[A]s the Supreme Court clarified in *Omnicare* and [the Second Circuit] more recently observed in *Abramson*, an opinion may implicitly convey 'facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view.'" *Id.* (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015)); *see also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175-76 (2d Cir. 2020). "In the context of a securities transaction, a reasonable investor expects that opinion statements rest on

some meaningful . . . inquiry, fairly align[ ] with the information in the issuer's possession at the time, and do not reflect baseless, off-the-cuff judgments[.]" *New England Carpenters*, 122 F.4th at 41 (citations and quotation marks omitted). "Statements of opinion are also actionable as false or misleading . . . if the opinion 'omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement [of opinion] itself.'" *Id.* (quoting *Omnicare*, 575 U.S. at 188). "'With respect to this [alternative] basis for challenging a statement of opinion, *Omnicare* held that the appropriate perspective for identifying whether a statement of opinion implies facts is that of the reasonable investor.'" *Id.* (quoting *Abramson*, 965 F.3d at 175). "The inquiry . . . is objective." *Omnicare*, 575 U.S. at 187. "Moreover, whether an omission makes an expression of opinion misleading always depends on context." *Id.* "[A]n investor cannot state a claim by alleging only that an opinion was wrong; the complaint must as well call into question the issuer's basis for offering the opinion." *Id.* at 194. Rather, as the Supreme Court has explained:

> The investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

*Id.*

Generally, a statement about "a projection relating to a company's future performance, [] is considered an opinion and not a statement of fact." *Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, No. 22-355, 2024 WL 2890968, *3 (2d Cir. June 10, 2024) (summary order). Indeed "[p]rojections are 'not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" *Id.* (quoting *Omnicare*, 575 U.S. at 189). "Similarly, '[d]isclosure of an item of information is not required . . . simply because it may be relevant or of

interest to a reasonable investor.'" *Id.* (quoting *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002)). "That is because '[r]easonable investors understand that [projections] sometimes rest on a weighing of competing facts' and 'do[ ] not expect that every fact known to an issuer supports its [projections].'" *Id.* (quoting *Omnicare*, 575 U.S. at 189-90); *see, e.g.*, *Tongue*, 816 F.3d 199, 212 (2d Cir. 2016) ("Defendants' statement that they 'expect[ed] a decision on Lemtrada by the end of the year' did not conflict with the information available to them at the time. . . . Defendants' statement is about timing, not about the likelihood of approval. Further, as set forth above, Defendants' optimism about the approval of Lemtrada was not in conflict with the FDA's comments, which had indicated that Lemtrada could be approved if it demonstrated an 'extremely large effect'"); *Maso Cap. Invs.*, 2024 WL 2890968, *3 ("Glaringly absent from the Amended Complaint are any particularized facts suggesting that the Parallel Projections were even created by or shared with the Company, its Board, or the Transaction Committee prior to the date of the Final Proxy. . . . Because the Amended Complaint 'does not contain the requisite 'detail as to the who, what, when, where, and how' of the [P]arallel [P]rojections,' . . . we have no trouble concluding that the Investors failed to adequately plead that the Defendants did not believe that the Management Projections were accurate at the time they were published, that they disclosed any untrue facts, or that they concealed information that made such projections misleading").

For the following reasons, the Court finds that Plaintiffs have alleged actionable statements. Defendants argue Plaintiffs' allegations attributed to former employees do not identify specific facts that were in contrast to Defendants' statements. *See* Dkt. No. 65 at 13. They contend, "[t]hese undated assertions are not a basis to 'plead contemporaneous falsity.'" *Id.* (quoting *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 221 (S.D.N.Y. 2020)). In *Wooglar*, the district court explained that "despite [the p]laintiff's contention that the [confidential

witnesses] were 'employed during the Class Period, which is all that is required to show the timing of the knowledge,' . . . such vague references as to timing do not establish that the [confidential witnesses] have 'provide[d] an adequate basis for believing that the defendants' statements were false.'" *Woolgar*, 477 F. Supp. 3d at 221 (quoting *Novak*, 216 F.3d at 314). The court noted that "[w]hile many of the [confidential witnesses] were employed . . . during the Class Period, they were also employed before and after it, making it unclear whether the purported issues they discuss actually existed during the Class Period. And one [employee] was not even employed during the Class Period." *Id.* The court noted that, "[i]n any event, the critical deficiency is that the [confidential witnesses'] allegations are largely *undated*, not their dates of employment. Without approximate dates as to when the [employee] had—or raised—certain concerns, their allegations do not plead contemporaneous falsity." *Id.*

Defendants also point to an example the Supreme Court gave in the *Omnicare* case:

> Suppose, for example, that in stating an opinion about legal compliance, the issuer did not disclose that a single junior attorney expressed doubts about a practice's legality, when six of his more senior colleagues gave a stamp of approval. That omission would not make the statement of opinion misleading, even if the minority position ultimately proved correct: A reasonable investor does not expect that every fact known to an issuer supports its opinion statement.

*Omnicare*, 575 U.S. at 190; see Dkt. No. 65 at 13. Likewise, Defendants cite to *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014), wherein the Third Circuit held that "a difference of opinion" between one confidential witness and the company was not actionable. Dkt. No. 65 at 13.

Plaintiffs' retort, "Unqualified statements are not opinions." Dkt. No. 67 at 13 (citing *In re Henry Schein, Inc. Sec. Litig.*, No. 18-CV-01428, 2019 WL 8638851, *13 (E.D.N.Y. Sept. 27,

2019)). In *Henry Schein*, the court concluded [] statements that "[t]he health care products distribution industry [is] highly competitive" and "[i]t's a fiercely competitive market," "do not reflect the judgment of the speaker or the speaker's expectations for the future and were not qualified by phrases such as 'I think' or 'I believe,' and thus do not constitute opinions." *Henry Schein*, 2019 WL 8638851, at *13.

The allegations in Plaintiffs' complaint fall somewhere between the cases cited by each party. Plaintiffs' allegations concerning the former employees are undated. Like in the *Wooglar* case, Plaintiffs provide approximate dates for when the former employees were employed by Plug, but they do not otherwise allege when those employees knew certain facts or made specific statements.

Plaintiffs identify the "Class Period" as May 9, 2023, to January 16, 2024. Dkt. No. 61 ¶ 7. FE1 was employed by Plug between 2021 and 2024. *See id.* ¶ 39. He visited the Tennessee Plant in June of 2023 and believed "the Georgia plant suffered from the same lack of funding." *Id.* ¶ 43. FE2 worked for Plug from 2022 to 2023. *See id.* ¶ 44. FE2 explained that Plug faced funding problems in "2023." *Id.* ¶ 45. FE3 worked at Plug "from 2021 to approximately March 2023." *Id.* ¶ 48. According to FE3, Plug delayed the Georgia Plant's production because of funding issues. *See id.* ¶ 50. FE4 was as an Office Manager and Senior Administrative Assistant at Plug from June 2022 to August 2024. *See id.* ¶ 53. FE4 discussed "the Tennessee and Georgia projects" with Mittelsteadt and Marsh. *Id.* ¶ 54. According to FE4, Mittelsteadt told both [Defendants] Marsh and Middleton their timeline was unrealistic. Mittelsteadt shared these concerns directly with FE4." *Id.* FE5 was the Director of Business Development-Stationary Storage from September 2021 to February 2024. *See id.* ¶ 56. At some point while working for Plug, FE5 learned "that Plug lacked the resources to design and deliver as promised because it

lacked workforce and could not pay its vendors. FE5 raised concerns through [a] reporting line but stated that management took no action." *Id.* ¶ 58. FE6 "was employed by Plug from June 2023 to March 2025." *Id.* ¶ 59. FE6 "had responsibilities in both finance and product strategy, including pricing strategy design, analytical tool development, cost reduction initiatives, and supply agreement management." *Id.* "FE6 explained that delays at the Georgia and Tennessee plants were due to quality and engineering issues. . . . Additionally, Plug faced challenges with operation management control." *Id.* ¶ 60. "FE6 participated in internal leadership talks about the hydrogen production timeline." *Id.* ¶ 61.

These allegations are not as specific as they could be. Most concerning are the allegations related to FE2, who worked for Plug between "2022 and 2023." *Id.* ¶ 44. Without specific dates, the Court and Defendants have no way to know if FE2 was even employed by Plug during the Class Period. However, contrary to Defendants' argument that the former employees presented "different opinions" to those held by Defendants, Dkt. No. 65 at 13, the Court agrees with Plaintiffs that the former employees stated facts, *see* Dkt. No. 67 at 14. For example, Plaintiffs allege that "Mittelsteadt also told FE4 that Plug's public hydrogen production forecasts were highly unrealistic and unattainable," Plug has "significant" "overruns on costs," and "production delays were attributable to substantial problems with the Cold Box." Dkt. No. 61 ¶¶ 54, 58, 60.

Whether those facts are true is a question for another day. But, assuming their truth, Plaintiffs have presented "particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement[s]" about when the Georgia plant "will" be up and running, "misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 183. Although Plaintiffs did not provide exact dates as to when

those facts purportedly became known, the allegations directly reference the Georgia plant, production issues that were connected to developments at the Georgia plant, and/or supply issues that Plaintiffs allege existed during the Class Period.

Additionally, although Plaintiffs are challenging timeline projections which are generally opinion statements, it is alleged that Defendants, like the defendants in *Henry Schein*, did not qualify the projections. As alleged by Plaintiffs, Defendant Marsh stated that he walked around the Georgia Plant and "So the important item is Georgia will be putting out liquid at the end of the month." Dkt. No. 61 ¶ 72. Similarly, Plaintiffs allege that Defendants told investors "We've actually tried to electrolyze this one. You know that we've been producing gaseous hydrogen there with our gaseous hydrogen plant. . . . We're not producing liquid today, but we are essentially ramping up the electrolyzer on path to be able to produce that liquid. . . . So long story and a quick comment, we are going to be producing liquid here in the month of August." *Id.* ¶ 81. Likewise, Defendants announced they would hold an event in August to "showcase[e] the accomplishments to date of its 15 ton per day . . . liquid green hydrogen plant in Camden County, Georgia." *Id.* ¶ 84.

These statements contain underlying facts: that Defendants viewed the space and tested the products; therefore, the Plant will be running in June and August. The statements do not include language such they "think it will" or "might be" producing liquid by June or August. This case differs from those in which defendants used language like "we believe" or "anticipate," *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018), or where the defendants "provided a list of . . . specific factors" that would impact their projections. *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 399 (S.D.N.Y. 2020).

Moreover, "'vague disclosures of general risks will not protect defendants from liability.'" *Id.* (citation omitted). Plaintiffs allege that Defendants warned investors that "[r]ecent cost pressures from global energy prices and inflation have negatively impacted access to our key raw materials"; that "if we, or the industry or economy at large, were to experience a recession and the demand for our product decreases, then we may have a large stock of pre-purchased inventory that could be unused and aging for a period of time"; and that progress in Georgia was slowed because of high temperatures. Dkt. No. 61 ¶¶ 64, 76, 81. However, these statements were general risks that did not specifically relate to Defendants' statements that the Georgia Plant "will" produce 15 tons of liquid hydrogen in June. Although a close call, the Court finds that Plaintiffs have alleged enough to permit the opinion statements to be actionable. Consequently, based on the foregoing, the safe harbor provision does not save all the statements that the Court has identified as forward-looking.

Additionally, some of the statements Defendants seek to bring under the safe harbor are not forward looking, particularly those concerning the risks of inflation, material availability, and labor shortages." Dkt. No. 66 at 13-14; *see e.g.*, Dkt. No. 61 ¶ 64 (describing the potential loss of suppliers); ¶ 76 (describing supply-chain risks); ¶ 91 (same). Defendants argue that Plaintiffs have failed to plead falsity for Defendants' statements that were "unrelated to the Georgia Plant, concerning the risks of inflation, material availability, and labor shortages." Dkt. No. 65 at 13-16. Defendants raise three arguments; each is discussed in turn.

First, Defendants argue that "risk disclosures are not actionable based on an alleged omission of existing facts because they 'are inherently prospective in nature' – they 'warn an investor of what harms may come to their investment' and 'are not meant to educate investors on what harms are currently affecting the company.'" Dkt. No. 65 at 14 (quoting *Bondali v. Yum!*

*Brands, Inc.*, 620 Fed. Appx. 483, 491 (6th Cir. 2015) (summary order)). However, in the Second Circuit, "cautionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized in the past and is virtually certain to materialize again." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021). As Plaintiffs state in their response, "'once a company speaks on an issue or topic, there is a duty to tell the whole truth.'" Dkt. No. 67 at 14 (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014)). In other words, it is possible to hold Defendants liable for warning of hypothetical risks regarding its supply chain that had already materialized.

Defendants argue their statements were not misleading, because they "did not claim that the Company had no payment issues with any of its suppliers." Dkt. No. 65 at 15. But as Plaintiffs explain, Defendants "told investors that they faced a *potential* risk that they'd lose access to key component suppliers and manufacturing vendors when they'd *already* lost that access due to nonpayment, which directly impacted their repeatedly touted construction timeline." Dkt. No. 66 at 15 (cleaned up). This leaves Defendants potentially liable. *See Set Cap.*, 996 F.3d at 85; *see also In re Vivendi*, 838 F.3d at 250 ("'The test for whether a statement is materially misleading under Section 10(b)' is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor'") (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004)).

Third, Defendants argue that they adequately disclosed their supply chain issues. *See* Dkt. No. 65 at 15. Plaintiffs allege in their amended complaint that Defendants disclosed that "[r]ecent cost pressures from global energy prices and inflation *have* negatively impacted access to our key raw materials." Dkt. No. 61 ¶ 76 (emphasis added). Defendants also disclosed that it "has experienced inflationary increases" in prices, and that it was seeking to modify agreements with

suppliers. *Id.* ¶ 91. However, as Plaintiffs note in their response, there is nothing to show that Plug disclosed its "failure to pay vendors" or that any such failure would delay production of the Georgia Plant. Dkt. No. 67 at 16; *see generally* Dkt. No. 61. Defendants thus engaged in an incomplete disclosure, acknowledging that its "access to . . . key raw materials" was reduced without providing an accurate explanation as to why, and mentioning negotiations with suppliers while failing to mention that it was not paying those suppliers. As "securities laws . . . protect investors from misleadingly incomplete disclosures," *In re Allergan PLC Sec. Litig.*, No. 18-CV-12089, 2019 WL 4686445, *1 (S.D.N.Y. Sept. 20, 2019), Plaintiffs have met their pleading burden with respect to these risk disclosures.

Finally, Defendants argue that the Plaintiffs have failed to adequately allege "scheme" liability. Dkt. No. 65 at 16. "'Rule 10b-5 and Section 17(a), which largely mirror each other, both consist of a "misstatement subsection" that is sandwiched between two "scheme subsections."'" *Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 478 (S.D.N.Y. 2023) (quoting *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022)). As Defendants explain "scheme claims require 'something beyond misstatements and omissions,' and yet the claims in this case are limited to the contents of public disclosures." *Id.* (quoting *S.E.C. v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022)). Defendants also contend that "'at no point do plaintiffs articulate with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it.'" *Id.* (quoting *Plumber & Steamfitters Loc. 773 Pens. Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021)) (alterations omitted).

In a footnote in their response, Plaintiffs assert that "Defendants incorrectly argue that there is no scheme liability where a claim is 'limited to the contents of public disclosures.'" Dkt. No. 65 at 16 n.3 (citing *Puddu v. 6D Glob. Techs., Inc.*, No. 15-CV-8061, 2021 WL 1198566, *11

(S.D.N.Y. Mar. 30, 2021) ("see[ing] no basis to conclude that a plaintiff may not establish, in a scheme liability claim, the existence of a 'manipulative or deceptive act' by pointing to alleged misrepresentations or omissions"). Plaintiffs do not otherwise dispute Defendants' arguments regarding "scheme liability."

"'To maintain a 10b-5(a) or (c) claim, a plaintiff must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue.'" *Anvil Tr. v. Ernst & Young*, No. 24-CV-9731, 2026 WL 743608, *8 (S.D.N.Y. Mar. 17, 2026) (quoting *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021)). "The plaintiff must 'articulate with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it.'" *Id.* (quotation omitted). Having thoroughly reviewed the amended complaint, the Court agrees with Defendants that there are insufficient allegations of a "scheme." *See generally* Dkt. No. 61. Beyond summarily disagreeing in a footnote, Plaintiffs do not argue otherwise; therefore, the "scheme liability" claim is dismissed.

**2. Scienter**

To bring a Securities Exchange Act Section 10(b) claim, a plaintiff must sufficiently allege scienter, which is "the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, and n.12 (1976)). "The requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). In the

securities context, recklessness is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *IKB Int'l S.A. v. Bank of Am.*, No. 12-CV-4036, 2014 WL 1377801, *20 (S.D.N.Y. Mar. 31, 2014), *aff'd sub nom. IKB Int'l S.A. v. Bank of Am. Corp.*, 584 Fed. Appx. 26 (2d Cir. 2014) (summary order). A complaint must lead to a "strong inference" of scienter. 15 U.S.C. § 78u-(b)(2)(A). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences[.]'" *Tellabs*, 551 U.S. at 324. Rather, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (footnote omitted).

As to circumstantial evidence, the Second Circuit has stated as follows:

> Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (citation and quotation marks omitted); *see also Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 397 (S.D.N.Y. 2022). As for "the Second Circuit's 'motive and opportunity' standard, [a] plaintiff must allege that defendants 'benefitted in some concrete and personal way from the purported fraud.'" *In re Fairway Grp. Holding Corp. Sec. Litig.*, No. 14-CV-950, 2015 WL 249508, *13 (S.D.N.Y. Jan. 20, 2015) (quoting *Novak*, 216 F.3d at 307-08). "Motives common to all corporate officers, such as the desire for the corporation to appear profitable, or the

desire to keep stock prices high to increase officer compensation, do not suffice for purposes of this inquiry." *Id.* (citation omitted); *see also Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).

"[W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." *Novak*, 216 F.3d at 314. "[A p]laintiff is only required to show that the source of the belief is someone in a position to have had personal knowledge." *Levy v. Maggiore*, 48 F. Supp. 3d 428, 443 (E.D.N.Y. 2014). "Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. "In both of these situations, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out." *Id.*; *see, e.g., In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 155 (S.D.N.Y. 2023) (declining to rely on former employee opinions because the plaintiffs "do not specify these employees' positions, length of employment, location of employment, or their respective roles or sources of knowledge") (collecting cases); *Employees' Ret. Sys.*, 794 F.3d at 307 ("hold[ing] that the Complaint adequately alleges false statements of material fact" where "[t]he Complaint also explains why these statements were fraudulent by detailing numerous [confidential witnesses'] observations that Green Mountain's inventory was decidedly not at 'appropriate levels.' These witnesses are former employees of Green Mountain and M.Block, and the Complaint specifies each witness's position, length of employment, and job responsibilities").

With respect to Defendants' statements regarding "inflation, material availability, and labor shortages," Defendants argue that "[t]here are no allegations suggesting circumstantial

evidence of conscious misbehavior for quarterly disclosures" regarding the non-plant statements. Dkt. No. 67 at 22. Defendants emphasize that there is no direct allegation of Defendants' actual knowledge of the statements' falsity. *See id.* However, mere recklessness suffices to meet the scienter requirement, *see IKB Int'l S.A.*, 2014 WL 1377801, at *20, so the lack of a direct allegation that Defendants were told about the payment issues or were otherwise aware of them, *see* Dkt. No. 67 at 22, does not defeat Plaintiffs' claim.

Moreover, Plaintiffs have presented enough allegations regarding the individual Defendants' specific roles within the company, their knowledge and conduct related to the Georgia Plant, and the former employees' positions and knowledge to infer scienter at this stage of the case. *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. Appx. 10, 15 (2d Cir. 2011) (summary order) ("[E]ven with the heightened pleading standard under Rule 9(b) and the Securities Reform Act we do not require the pleading of detailed evidentiary matter in securities litigation") (citation and quotation marks omitted).

Plaintiffs allege that Defendant Marsh visited the Georgia plant, *see* Dkt. No. 61 ¶¶ 6, 108; and that six separate former employees of varying positions knew that Plug was facing challenges with the Georgia Plant and/or Plug's suppliers and either told or tried to tell the individual Defendants or other management within the company about the problems, *see id.* ¶¶ 38-61. For example, Plaintiffs allege that "[a]ccording to FE4, Mittelsteadt told both Marsh and Middleton their timeline was unrealistic." *Id.* ¶ 54. FE2 was allegedly one of Plug's contractors who Plug stopped paying, leaving "FE2 with approximately $500,000 [] in unpaid invoices." *Id.* at ¶ 44. FE5, whose "responsibilities encompassed the sale of large-scale hydrogen fuel cell systems," "raised concerns through reporting line" about Plug's lack of resources to design and deliver" because of a lack of "workforce" and inability to "pay its vendors." *Id.* at ¶¶ 56-68.

Taken together, Plaintiffs allegations allege a strong inference that Defendants knew or had information for which they could have known about their production issues and their impact on the timeline for development of the Georgia Plant.

Plaintiffs also allege "Defendants portrayed this speed as part of Plug's core competitive advantage and a key reason for investors to believe in Plug's ability to meet its ambitious production and profitability targets," *id.* at ¶ 32, which demonstrates a common motive.

In sum, Plaintiffs' allegations are sufficient for Plaintiffs' claims to proceed.[7]

**3. Loss Causation**

Defendants' final argument on Plaintiffs' claims concerns loss causation, insofar as they contend "[t]here are no allegations connecting declines in Plug Power's stock price to any revelation about allegedly missed payments to suppliers, which is the alleged omission plaintiffs claim made the disclosure materially misleading." Dkt. No. 64 at 24. Therefore, Defendants argue "Plaintiffs have not plausibly alleged loss causation in those circumstances." *Id.*

Plaintiffs argue in their response that Defendants' "failure to complete the Georgia Plant is a materialization of the risk caused in part by their nonpayment to vendors . . . . Moreover, Plaintiff's theory of loss causation is 'supported by contemporaneous analyst commentary.'" Dkt. No. 67 at 24 (citations omitted). Plaintiffs assert that "the analyst commentary and downgrades represented materializations of the concealed risk that Defendants could not complete and operate the Georgia Plant in the compressed timeframe they had promised." *Id.* at 25.

---

[7] The issues concerning forward-looking statements and scienter are complex and both parties have presented thorough and detailed briefing to assist the Court in its decision making. The Court finds that Plaintiffs have stated just enough for most of their claims to proceed, but nothing in this Memorandum-Decision and Order should be construed as an opinion as to how the Court will rule on a fully briefed motion for summary judgment.

"Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)). "[L]oss-causation pleadings are not subject to those heightened requirements. . . . Accordingly, [a court] evaluate[s the] allegations under the default pleading standard of Rule 8(a)(2), which requires 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Huey v. Anavex Life Scis. Corp.*, 180 F.4th 56, 72 (2d Cir. 2026) (quoting FED. R. CIV. P. 8(a)(2)) (internal citation omitted). "The task of courts in evaluating loss causation, then, is to conduct a precise inquiry to ascertain the plausible existence of causal link and proximity." *Id.* at 71. "Plaintiffs' burden is not a heavy one. . . . The complaint must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160, 187 (2d Cir. 2015) (citations omitted).

Generally, a corrective disclosure must "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint. . . . . A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010). However, a plaintiff may plead loss causation "*either* by alleging (a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; *or* (b) that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Tobia v. United Grp. of Companies, Inc.*, No. 1:15-CV-1208, 2016 WL 5417824, *14 (N.D.N.Y. Sept. 22, 2016) (quoting *Carpenters Pension*, 750 F.3d at 232).

In the amended complaint, Plaintiffs set forth the timing and drops in stock prices related to Defendants' alleged misstatements about the Georgia Plant. *See* Dkt. No. 61 ¶¶ 100-05. Plaintiffs also reference three reports from independent outlets wherein it was noted that the problems facing the Georgia Plant would affect other Plug projects, revenue targets, and profitability. *See id.* ¶¶ 103-05. Plaintiffs argue that these reports represent a "materialization of the risk[s]" associated with Defendants' failure to pay its vendors and/or not complete the Georgia Plant on time. Dkt. No. 67 at 24-25. At this stage of the case, the Court agrees. The Court finds that Plaintiffs have sufficiently alleged loss causation such that the Section 10(b) claim will be permitted to proceed.

Plaintiffs' Section 20(a) claim will also proceed because the Court has not entirely dismissed the Section 10(b) claim. *See In re Hyzon Motors Inc. Sec. Litig.*, 815 F. Supp. 3d 209, 247 (W.D.N.Y. 2025) ("Because Defendants' sole argument regarding Plaintiff's Section 20(a) claims is that there is no predicate violation, the Section 20(a) claims survive with respect to the Section 10(b) claims that will be permitted to proceed").

## IV. CONCLUSION

After carefully reviewing the record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion to dismiss, Dkt. No. 64, is **GRANTED in part and DENIED in part**;[8] and the Court further

**ORDERS** that the Clerk of the Court shall amend the docket to reflect the accurate spelling of Defendant Sanjay K. Shrestha's last name; and the Court further

[8] Plaintiffs' "scheme liability" claim is dismissed. Likewise, the statements identified on pages ten through twelve which the Court found to be inactionable, cannot later be used to support Plaintiffs' claims. All claims are otherwise permitted to proceed.

**ORDERS** that the Clerk of the Court shall reset Defendants' answer deadline; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of the Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 28, 2026
Albany, New York

Mae A. D'Agostino
U.S. District Judge